UNITED STATES v. KEYSTONE WATCH CASE CO. et al.

(District Court, E. D. Pennsylvania. January 2, 1915.)

No. 773.

1. MONOPOLIES (§ 12*)—ANTI-TRUST ACT—"RESTRAINT OF TRADE" PROHIBITED.
     To fall within the prohibition of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821), it is necessary that the "restraint of trade," which it is the purpose of both sections to prevent, should be direct, and not merely incidental, and should also be undue or unreasonable. If it be both direct and undue, no disguise will 'save it; but the courts will search for the substance and the actual effect of the transaction, and will grant the needful relief.

     [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*
     For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MONOPOLIES (§ 14*)—ANTI-TRUST ACT—ACTION CONSTITUTING "RESTRAINT OF TRADE."

The mere fact that a manufacturing corporation has largely increased its business, either by enlarging its plants or purchasing the plants and business of other concerns, if they are acquired openly and by proper methods, does not effect an undue "restraint of trade," within the meaning of Sherman Anti-Trust Act, §§ 1, 2, where the volume of production is not lessened, but increased, prices are not inflated, and the power given by the volume of business is not improperly used to injure either competitors or the public.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 11; Dec. Dig. § 14.*]

3. MONOPOLIES (§ 17*)—ANTI-TRUST ACT—ACTS CONSTITUTING RESTRAINT OF TRADE.

Defendant, the Keystone Watch Case Company, acquired the plants, business, and good will of several manufacturers of filled watch cases and also of two or three manufacturers of watch movements. All of the plants so purchased were continued in operation and their production increased. After it had acquired and was operating such plants, its board of directors adopted, and it issued to a large number of the prominent jobbers and wholesale dealers in the United States, a circular in which it stated its intention to thereafter sell its products only to those dealers who voluntarily conformed to its wishes, which were (1) that certain of its cases and watches, which were not patented, should be resold only at such prices as it should fix, and (2) that dealers to whom it sold the same should not deal in any cases except those made by it. It then proceeded to strictly enforce such policy, to which some of the jobbers conformed, while those who refused were cut off from purchasing the Keystone products, which constituted perhaps 50 per cent. of those in the market. *Held*, that while, up to that time, there was nothing unlawful in its acts, the adoption and enforcement of such policy operated as a direct and unlawful restraint upon interstate trade, in violation of Sherman Anti-Trust Act, §§ 1, 2.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

4. MONOPOLIES (§ 17*)—ANTI-TRUST ACT—UNLAWFUL RESTRAINT OF TRADE.

Defendant made a watch movement known as the "Howard," which was a high grade watch, material parts of which were covered by valid patents. Defendant made direct agreements with the jobbers to whom it sold the watch, fixing the price at which they might sell to retailers, and also by a mere notice on the boxes in which the watch was sold to retailers attempted to fix the price at which they should sell. *Held*, that the agreement with the jobbers was within its rights under the patent law, but that when it sold to the jobber it had fully exercised its right, and its notice to subsequent purchasers was an unlawful restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

5. MONOPOLIES (§ 12*)—UNLAWFUL RESTRAINT OF TRADE—STANDARD FOR DETERMINING.

Whether a combination or course of action is unlawful, as likely to effect an unreasonable restraint of trade, where those engaged in it have made no declaration of its purpose, must be determined in the light of past experience and observation; but if, at the time the question is submitted for decision, it has already been in effect for a sufficient length of time, the question may better be determined by the effect it has actually produced.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. **Monopolies (§ 12*)—Unlawful Restraint of Trade—Standard for Determining.**

While a large increase in the business of a manufacturer necessarily results in a restraint of the trade of competitors, the business is not for that reason, nor because of its size alone, to be condemned as unlawful; but it is unlawful, as an unreasonable restraint, if the growth has been accomplished by fraudulent, unfair, or oppressive methods against competitors, by arbitrarily fixing or maintaining prices, by limiting production or otherwise, by deteriorating the quality of the article produced for the same price, or by arbitrarily reducing the wages of workmen or the price of raw material.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

7. **Monopolies (§ 12*)—Anti-Trust Act—Restraint of "Trade."**

The prohibition against restraint of "trade," embodied in Sherman Anti-Trust Act, §§ 1, 2, is directed to the business of buying or selling for gain, whenever the transaction forms a part of commerce among the states or with foreign countries.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, First and Second Series, Trade.]

8. **Monopolies (§ 12*) — Anti-Trust Act — Restraint of Trade — "Restrained."**

Trade may be "restrained," within the meaning of Sherman Anti-Trust Act, §§ 1, 2, by being hindered, obstructed, or destroyed.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

9. **Monopolies (§ 12*)—Definition—Anti-Trust Act.**

The usual meaning of "monopoly" is the acquisition of something for one's self, and while the word is used most appropriately when the whole of a given trade is acquired, the terms of Sherman Anti-Trust Act, § 2, make it applicable to monopolization of a part of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, First and Second Series, Monopoly.]

In Equity. Suit by the United States against the Keystone Watch Case Company and others. Decree for the United States.

Thomas Watt Gregory, Atty. Gen., and Thurlow M. Gordon and Wm. T. Chantland, Sp. Asst. Attys. Gen., all of Washington, D. C., for the United States.

Peter B. Olney, George Carlton Comstock, and Harold T. Edwards, all of New York City, and Hyneman & Bartlett and John G. Johnson, all of Philadelphia, Pa., for defendants.

Before BUFFINGTON, HUNT, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. In December, 1911, the United States filed a petition, or bill in equity, against the Keystone Watch Case Company of Pennsylvania and seven individuals, officers and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

directors of the company, charging them with violating the Anti-Trust
Act of 1890. The generic charge is that the defendants—

"* * * have heretofore made—and the business of said corporation de-
fendant is conducted under and in pursuance of—certain contracts, combina-
tions, and conspiracies, in restraint of the trade and commerce among the
States and with foreign countries in filled watch cases and in a watch known
as the Howard watch, and are attempting to monopolize the said trade and
commerce in filled watch cases and said watch, and have monopolized a part
thereof."

The bill then goes on to state:

"The watch industry in the United States is divided into two parts, to
wit, the watch case industry and the watch movement industry. Of all watch
cases manufactured and sold, more than 90 per cent. are filled watch cases;
that is, cases made of a base metal surfaced with gold of a varying quantity
and degree of purity, the number of solid gold and silver cases being com-
paratively so small as to constitute a negligible quantity in the market.
Hereinafter, when watch case industry or trade is mentioned, it is the filled
watch case industry or trade to which reference is had.

"Originally there were engaged in the manufacture of filled watch cases
in the United States, and in the interstate and foreign trade and commerce
therein, a number of separate and independent firms and corporations, no one
of which possessed such a per cent. of the industry and trade as to enable
it to exercise a dominating influence over the same, and each of whom was
engaged in competition with all the others. This condition of the industry
and trade continued until about the year 1899."

Taking up the situation at this point, the government makes certain
specific averments, of which one group relates to the period from 1899
to 1903; another, to the period from 1903 to 1910; and a third, to
the period from 1910 to the time of filing the bill. In our view of the
case, a division into 2 periods will be sufficient—the first, before 1903;
and the second, from the beginning of that year onward. But, before
turning to the facts, we may state briefly the rules that have been laid
down by the Supreme Court to govern controversies under the act of
1890.

The first and second sections of the act are as follows:

"1. Every contract, combination in the form of trust or otherwise, or
conspiracy, in restraint of trade or commerce among the several states or
with foreign nations, is hereby declared to be illegal. Every person who shall
make any such contract, or engage in any such combination or conspiracy,
shall be deemed guilty of a misdemeanor, and on conviction thereof shall be
punished by fine not exceeding five thousand dollars, or by imprisonment not
exceeding one year, or by both said punishments, in the discretion of the
court.

"2. Every person who shall monopolize, or attempt to monopolize, or com-
bine or conspire with any other person or persons to monopolize, any part of
the trade or commerce among the several states or with foreign nations, shall
be deemed guilty of a misdemeanor, and on conviction thereof shall be pun-
ished by fine not exceeding five thousand dollars, or by imprisonment not
exceeding one year, or by both said punishments, in the discretion of the
court."

The scope of these sections has been determined by the Supreme
Court in the Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed.
619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. It will be suffi-
cient to quote the following passage from the opinion:

"As to the first section, the words to be interpreted are:

"'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce, * * * is hereby declared to be illegal.'

"As there is no room for dispute that the statute was intended to formulate a rule for the regulation of interstate and foreign commerce, the question is: What was the rule which it adopted?

"In view of the common law and the law in this country as to restraint of trade, which we have reviewed, and the illuminating effect which that history must have under the rule to which we have referred, we think 'it results:

"(a) That the context manifests that the statute was drawn in the light of the existing practical conception of the law of restraint of trade, because it groups as within that class, not only contracts which were in restraint of trade in the subjective sense, but all contracts or acts which theoretically were attempts to monopolize, yet which in practice had come to be considered as in restraint of trade in a broad sense.

"(b) That, in view of the many new forms of contracts and combinations which were being evolved from existing economic conditions, it was deemed essential by an all-embracing enumeration to make sure that no form of contract or combination, by which an undue restraint of interstate or foreign commerce was brought about, could save such restraint from condemnation. The statute under this view evidenced the intent, not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference that is an undue restraint.

"(c) And as the contracts or acts embraced in the provision were not expressly defined, since the enumeration addressed itself simply to classes of acts—those classes being broad enough to embrace every conceivable contract or combination which could be made concerning trade or commerce or the subjects of such commerce—and thus caused any act done by any of the enumerated methods anywhere in the whole field of human activity to be illegal if in restraint of trade, it inevitably follows that the provision necessarily called for the exercise of judgment which required that some standard should be resorted to for the purpose of determining whether the prohibitions contained in the statute had or had not in any given case been violated. Thus, not specifying, but indubitably contemplating and requiring, a standard, it follows that it was intended that the standard of reason, which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute, was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided.

"And a consideration of the text of the second section serves to establish that it was intended to supplement the first, and to make sure that by no possible guise could the public policy embodied in the first section be frustrated or evaded. The prohibitions of the second embrace ' * * * every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states or with foreign nations. * * *'

"By reference to the terms of section 8 it is certain that the word 'person' clearly implies a corporation as well as an individual.

"The commerce referred to by the words 'any part,' construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is, it includes any portion of the United States, and any one of the classes of things forming a part of interstate or foreign commerce.

"Undoubtedly, the words 'to monopolize' and 'monopolize' as used in the section reach every act bringing about the prohibited results. The ambiguity, if any, is involved in determining what is intended by 'monopolize.' But this ambiguity is readily dispelled in the light of the previous history of the law of restraint of trade to which we have referred, and the indication which

it gives of the practical evolution by which monopoly and the acts which produce the same result as monopoly—that is, an undue restraint of the course of trade—all came to be spoken of as, and to be indeed synonymous with, restraint of trade. In other words, having by the first section forbidden all means of monopolizing trade—that is, unduly restraining it by means of every contract, combination, etc.—the second section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section; that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about, or are brought about, be not embraced within the general enumeration of the first section. And, of course, when the second section is thus harmonized with and made, as it was intended to be, the complement of the first, it becomes obvious that the criterion to be resorted to in any given case for the purpose of ascertaining whether violations of the section have been committed is the rule of reason, guided by the established law and by the plain duty to enforce the prohibitions of the act and thus the public policy which its restrictions were obviously enacted to subserve. And it is worthy of observation, as we have previously remarked concerning the common law, that although the statute by the comprehensiveness of the enumerations embodied in both the first and second sections makes it certain that its purpose was to prevent undue restraints of every kind or nature, nevertheless by the omission of any direct prohibition against monopoly in the concrete it indicates a consciousness that the freedom of the individual right to contract, when not unduly or improperly exercised, was the most efficient means for the prevention of monopoly, since the operation of the centrifugal and centripetal forces resulting from the right to freely contract was the means by which monopoly would be inevitably prevented, if no extraneous or sovereign power imposed it, and no right to make unlawful contracts having a monopolistic tendency were permitted. In other words, that freedom to contract was the essence of freedom from undue restraint on the right to contract."

[1] To fall within the prohibitions of the statute it is necessary that the unlawful restraint of trade—and this is not always the same thing as the mere restraint of competition—should be direct, and not merely incidental, and should also be undue or unreasonable. If it be both direct and undue, no disguise will save it; courts will search for the substance and the actual effect of the transaction, and, if trade be unlawfully restrained thereby, will grant the needful relief. There are many methods by which trade may be unduly restrained, and among these are contracts or combinations to fix and maintain prices, or to boycott the goods of a manufacturer or other dealer. We confine our attention to these two violations of the act, because the present controversy turns essentially upon the facts relating to these subjects. And we need not discuss the law further, since there is no dispute concerning the accuracy of the foregoing statements, but may turn at once to the relevant facts.

As might be expected in a record so voluminous, the evidence, whether oral or in writing, is not always either relevant or competent; but we shall not discuss it in detail, contenting ourselves with finding such of the ultimate facts as seem to be necessary. They are as follows:

The present Keystone Company is the second of that name, both of them being Pennsylvania corporations. The first was organized in 1886, and was the successor of several Philadelphia manufacturers, beginning with James Boss, the inventor of the filled or rolled-plate case, and comprising also John Stukert, Hagstoz & Thorpe, and C.

N. Thorpe & Co. These firms and their corporate successor manufactured superior cases and acquired an excellent reputation in the trade. Owing to the death of certain persons that had been interested in the business, and to the consequent need of providing for the demands of their estates, some new financial arrangements seemed to be desirable. At the same time an association known as the T. Zurbrugg Company was manufacturing an inferior grade of watch cases at Riverside, N. J., and some of the persons interested in that association had certain financial connections with the two estates just referred to. (A year or two before, the Zurbrugg Company had bought a small business, owned by J. Muhr & Bro. of Philadelphia, and had combined it with their own.) It was believed by the old Keystone Company and by the Zurbrugg Company that a union of the two enterprises would be mutually advantageous, so that both grades of cases might be made under one management. Accordingly, a new company—the present defendant—was incorporated, and this company bought outright the title to the plant, business, and good will of the old corporation and of the Zurbrugg Company. The persons interested in these two enterprises received either cash or stock in the new company at their option. This transaction took place in July, 1899.

In the following August the Philadelphia Watch Case Company was organized for the purpose of selling the product of the Riverside plant. All of its capital stock was owned by the Keystone Company. As already stated, this product was inferior in grade, and a separate sale thereof seemed advisable, in order to avoid confusing the cases made in the two plants respectively.

Early in 1900 the capital stock of the New York Standard Watch Company, a New Jersey corporation with a plant at Jersey City, was in the market. This company did not manufacture cases, its only product being inexpensive movements. The Keystone Company purchased for cash the capital stock of the Standard Company, the object being to supply the demand for cheap completed watches. The Keystone Company had found some difficulty in selling its cheaper watch cases because of the lack of cheap movements to go with them, the movements manufactured by the principal movement companies being relatively too expensive. The separate corporate organization of the Standard Company was continued, and the size and the product of the plant were increased.

Early in January, 1901, the Philadelphia firm of Bates & Bacon, a small manufacturer of cases, sold all its property to the Keystone Company, the machinery at cost, and the finished product at selling prices.

In the same month, a small movement business at Waltham, Mass., owned by the United States Watch Company, offered to sell out to the Keystone Company, and in June, or thereabouts, the sale was made. The object of the purchaser was to manufacture medium-priced movements at Waltham, and for this purpose additional capital was furnished, and the plant and facilities were enlarged. A New Jersey corporation by the same name—United States Watch Company—with an authorized capital of $1,000,000 was organized, and operated the Walt-

ham plant for about two years, manufacturing medium-priced movements only. The business, however, was not successful.

In January, 1903, the watch movement business of the E. Howard Clock Company was offered for sale by a receiver. This company had formerly manufactured an excellent and favorably known movement, but for several years the business had been discontinued. Seeing an opportunity to use the reputation of the Howard movement to aid the United States Watch Company's business at Waltham, the Keystone Company bought the good will, machinery, and trade-marks of the Clock Company, so far as they related to watches and watch movements, and moved everything to Waltham. The United States Watch Company was thereupon abandoned, and a new company was organized under the laws of New Jersey, called the E. Howard Watch Company—all of its stock being owned by the Keystone Company—and the Howard Company took over the United States Company's plant, and has since been manufacturing fine and expensive movements at Waltham. The watch movements formerly manufactured by the E. Howard Clock Company had in no way competed with the product of the Keystone Company, whose movements were neither high-grade nor expensive.

In December, 1902, the common stock (4,000 shares) of the Crescent Watch Case Company of Newark, N. J., was offered to the Keystone Company, and was purchased in the following February, being paid for partly in cash and equivalent obligations, and partly (one-fourth) in the common stock of the Keystone Company. (Later, in 1906, the preferred stock of the Crescent was also bought by the Keystone Company for cash.) The reasons for the purchase were these: The Crescent cases and the movements of the well-known Waltham Watch Company (not the United States Company referred to above) had both been handled by one firm, who acted as the exclusive selling agent for each, so that the sale of Keystone cases to be used with the movements of the Waltham Watch Company was interfered with, and the sale of Crescent cases to be used with other than Waltham movements was also interfered with. The union of the two companies seemed likely to eliminate both these hindrances. Moreover, their respective sales were in different markets, where they competed, not so much with each other as with other manufacturers, of whom there were several actively engaged in business and apparently prospering. The union was voluntary on the part of both companies; the Keystone Company exercised no pressure or coercion upon the Crescent, and the trade of neither was restricted or diminished. Moreover, prices to the public were not raised as a result of the union, except perhaps to a small extent.

From time to time the issued capital stock of the Keystone Company had been increased, reaching $6,000,000 in the end—all of it having been issued for cash—and in 1910 all the assets of the Philadelphia, the Standard, the Howard, and the Crescent Companies were formally transferred to the Keystone Company, and the four companies first named abandoned their separate organizations (which had

theretofore been maintained) and ceased to exist, either actually or in effect.

In 1903 the Keystone Company became interested in the watch case business in Canada under the following circumstances:

For several years the American Watch Case Company of Toronto, Limited, had been manufacturing in the Dominion, but its plant was not satisfactory, and for this or some other reason its business was for sale. This fact became known to the Keystone Company, and to the Elgin and the Waltham movement companies. No one of these three had been able to do much in the Canadian market, owing in part to the tariff of that country, and in part to other reasons not important to enumerate. These three companies determined, therefore, to use the Toronto Company in order to enter the Canadian market with Keystone cases, and also with Elgin and with Waltham movements, and to that end bought the capital stock of the Toronto company— the Keystone acquiring 851 shares out of 2,000, and the rest being held largely in the interest of the Elgin and the Waltham companies. The American Watch Case Company has since that time improved its methods of manufacture, and has increased its business. Later a selling agent for Canada was organized, in which the Keystone Company owns the capital stock. If this transaction has any relevancy, we need only add that it did not restrain, but rather benefited, the foreign trade with Canada in cases and in movements.

[2] Up to this time, we discover nothing unlawful in the operations of the Keystone Company. No doubt it had been growing, and it had grown in part by acquiring or controlling several other plants; but it had not acquired them by improper methods, and it had not used its acquisitions improperly. There was no concealment about its growth, and the trade was well informed about its operations. Its plants were enlarged or improved, the volume of production was increased, prices were not inflated, competitors were not unlawfully attacked, and we find nothing in the evidence that would justify us in condemning the foregoing steps in the company's activity. A merchant may without offense add one department to another as his business prospers, or his ambition expands; for the size and the varied character of his enterprise do not in themselves violate the Anti-Trust Act. Size does not of itself restrain trade or injure the public; on the contrary, it may increase trade and may benefit the consumer; but, if the power given by the volume of a particular business is improperly used to injure either a competitor or the public, or if such power evidently tends toward the injury of either, the mischief either done or threatened is condemned by the statute.

[3] In this connection, it may be observed that, as power increases, the temptation to abuse it is likely also to increase, so that the acts of an influential factor in a particular trade may well be scrutinized with more suspicion than the acts of a weak and inconspicuous contributor. And we have now reached a point in these transactions when we think the evidence establishes that the defendant company did use its power unlawfully. Beginning in 1904, or thereabouts, it made several attempts—perhaps not very numerous, but numerous enough—

that showed a definite purpose to restrain trade by attempting to fix and maintain prices, and by using a species of boycott or blacklisting in order to lessen the trade of its rivals. We shall not stop to detail the attempts of this character that were made during the period from 1904 to 1910, because the policy and system to which we refer were manifested with unmistakable distinctness in the latter year, and were carried on with vigor and persistence. It will be sufficient, therefore, to state what was attempted, and what was actually done, from January, 1910, forward.

On the 15th of that month, the following circular was formally adopted by the Keystone Company's board of directors, and was sent to 131 of the largest and most prominent jobbers or wholesalers in the United States:

"The Keystone Watch Case Company, Nineteenth and Brown Sts.

"Philadelphia, January 15th, 1910.

"Dear Sir: We inclose herewith our new price list which we are mailing to the retail trade today. These prices are subject to the usual catalogue discount and the case discount only.

"We also inclose memoranda of the prices at which Boss, Crescent, Planet, Crown, and Silveroid cases and Excelsior watches will be billed in future to our jobbers. These prices are net, subject to the cash discount only.

"These prices are confidential.

"For the best interests of our business we have determined to sell our goods exclusively to jobbers whom we find voluntarily conforming to our wishes as to the disposition by them of such goods.

"We shall make all specific sales, except of Howard watches, without any restrictions whatever.

"Whether or not our wishes as hereinafter stated be complied with, we shall from time to time exercise our right to select the jobbers to whom we shall sell our goods, and we shall, irrespective of any past dealings, refuse to sell to those jobbers who, in our opinion, handle our goods in a manner detrimental to our interests, or whose dealings with us are in any other respect unsatisfactory.

"Our present wishes are as follows:

"First. Our goods bearing the following trade-marks, to wit, Boss, Crescent, Planet, Crown, Silveroid, and Excelsior, will be sold by us to our jobbers at fixed prices, subject to a cash discount, and we desire that sales of these goods by jobbers, whether to retailers or to jobbers, shall be without deviation at the prices fixed by us for sales to retailers, subject only to the cash discount.

"Second. Howard watches are sold only under the terms of the license covering their sales.

"Third. On all our other goods we place no restrictions as to the prices at which they are to be sold by jobbers.

"Fourth. And, further, we desire that the jobbers to whom we sell our goods bearing the following trade-marks, to wit, Howard, Boss, Crescent, Planet, Crown, Silveroid, and Excelsior, shall not deal in any watch cases other than those manufactured by us.

"Fifth. All advertisements of our goods will be subject to our approval.

"Very truly yours,          The Keystone Watch Case Company."

Officers or agents of the company followed up this circular by visits to the selected jobbers—although perhaps not to all of them—and assured them that the letter meant exactly what it said, and that the policy outlined therein would be rigorously carried out. And it was insisted upon and was carried out. Some of the jobbers assented to the company's wishes, and with more or less reluctance gave up buy-

ing from other manufacturers, while the jobbers that refused to assent were cut off from the Keystone product altogether, unless they obtained it through surreptitious channels.

We do not think it necessary to spend time over the foregoing circular. We regard it, not as a request, but as a threat; and not as an empty threat, but as a real menace from a strong manufacturer. The defendant company attempts to justify both the circular and its own conduct before and after the circular was issued, by the argument that the selected jobbers were its "exclusive agents," and therefore were properly burdened with any conditions to which they might agree. But the relation of principal and agent did not exist between the company and the jobbers. They were not agents, paid for their services by salary or commission, and owing a duty to report and account; they were merely customers of the defendant company, who bought its unpatented cases by a transaction of outright purchase, and thereby took a complete title to the cases and acquired an unrestricted right to sell. And, moreover, it should be observed that they were already established customers, not only of the defendant company, but also of its competitors, and had already become trade outlets for every manufacturer of cases whose wares they had been accustomed to buy. Now, what the defendant company did was either to close these already existing and already utilized outlets, or to narrow them materially, so far as the cases of its competitors were concerned; and we think the proposition need not be discussed that this was pro tanto a direct and unlawful restraint of trade.

And it is not sufficient to answer that these competitors appear to have withstood the attack with more or less success, and that their total trade did not always, or even often, diminish. Where or how they made up the loss that they must have sustained is not material; it is certain that they must have lost whatever trade they had previously enjoyed with those jobbers that yielded to the threat of the defendant's circular; and it seems clear, therefore, that in this degree at least there was an unlawful restraint of trade. In other words, if this section of the trade had not been taken away from the defendant's competitors, we may reasonably suppose that they would have retained it; and this fact seems to be a final answer to much of the evidence, the tables and lists, of varying scope and value, that have been laid before us, and were offered to show that on the whole not much damage, if any, was done by the offending circular and the defendant's unlawful conduct. A recent decision of the Supreme Court on the general subject of blacklisting is Eastern States, etc., Ass'n v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, opinion delivered June 22, 1914.

The proportion of the trade in filled cases that the defendant company was enjoying from 1903 onward is in dispute, and is not altogether easy to determine with accuracy; but we shall do the defendant no injustice if we adopt the figures of its counsel, and say that:

"When the acquisitions were completed [the company] had from 50 to 55 per cent.; when the petition was filed, it had from 42 to 47 per cent."

But we have no hesitation in adding that, even with this proportion of the business, the defendant did not dominate the trade. It had then, and has always had, a number of active and successful rivals, and we see no reason to doubt that there was business enough for all. No complaint on the part of the other manufacturers would have been made or would have been justified, as far as we can determine, if the defendant had not undertaken the policy we have condemned; and it is essentially this—and one other matter to be spoken of presently—that furnishes the government with just ground for complaint. It is probable that the policy has not been successful, save in a limited degree and for a limited time; but in our opinion it is a plain restraint of trade within the act of 1890, and the government is entitled to enjoin it.

One or two other matters referred to in the pleadings and in the evidence should be briefly referred to: First, the defendant company's agreements with the Waltham and the Elgin movement companies respectively. These companies are not parties to the bill, and no relief is prayed against the agreements. The subject was introduced by the government merely as an argument to support its averment that the defendant has been steadily pursuing the definite object of restraining interstate and foreign trade in filled cases. The facts are as follows:

The course of the watch trade in the United States differs from its course in foreign countries. Here, both the jobber and the retailer buy movements and cases separately, and the retailer fits the case and the movement together as the ultimate consumer may desire. But in foreign countries both the jobber and the retailer deal in the completed watch. Efforts by the American companies to change the foreign course of trade were unsuccessful, and it was found that the custom there must be respected, and that watches must be exported in completed form. The agreements referred to were made with the object of securing a share in this comparatively unoccupied field. The Keystone Company obtained from the Waltham and the Elgin companies the exclusive right to sell their movements in certain foreign countries, fitting the movements into the Keystone cases. The Waltham contract covers the continent of Europe, with the exception of France and Spain, and in this territory the Waltham company had previously been doing but little business. The Keystone cases were to be made at the Riverside plant, and all the movements were sold to the Keystone Company at favorable prices, for such export trade only. The Elgin contract makes the Keystone Company the sole export jobber of the Elgin movements, except for trade to Canada, and fixes prices of the movements for export only, providing that the Keystone Company shall fit the movements into its own cases, and shall then export the complete watch.

We see nothing unlawful in these contracts. On the contrary, they appear to show a laudable effort to increase American trade with foreign countries. They were intended to help our own merchants in the struggle to enter new markets, and we are unable to find that they operated injuriously to restrain the trade of any American competitor.

218 F.—33

[4] The other subject is the system under which the Howard watch was sold. The defendant company attempted to restrict the prices at which the wholesaler or jobber might sell to the retailer, and to this end made a direct agreement with the jobber. As we understand the decisions, such an agreement was within the company's lawful rights. Certain material parts of the Howard watch were covered by bona fide patents taken out and used for a lawful purpose, and as the owner of these patents the company had the right to make a direct agreement with the jobbers whereby a minimum price was fixed at which the jobber might sell. Bement v. Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880. But the company went further, and by mere notice to the retailer, accompanying the box in which the watch was sold by the jobber, attempted to fix the minimum price at which the retailer might sell to the consumer. No direct agreement was made with the retailer. When the company sold the watch to the jobber it had fully exercised its right to vend, and had no right to use the notice subsequently given in order to control the price at which the retailer might sell. Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185.

We should end the discussion at this point, if it were not for the recent decision in U. S. v. Harvester Co. (D. C.) reported in 214 Fed. at page 987. The majority opinion, as we understand it, is put upon the ground that the combination there in question—which was made in 1902, but was not proceeded against until 1912—was and continued to be unlawful because at the beginning it suppressed competition between corporations that controlled about 80 per cent. of the trade in harvesting machines. This conclusion was reached, although there was no evidence of coercion in the original combination, and no evidence of oppression or of actual injury to trade in the subsequent conduct of the business. In the principal opinion, Judge Smith says:

"While the evidence shows some instances of attempted oppression of the American trade by the International and the American Companies, such cases are sporadic, and in general their treatment of their smaller competitors has been fair and just; and if the International and American Companies were not in themselves unlawful there is nothing in the history of the expanding of the lines of manufacture, so as to make an all the year around business, that could be condemned.

"The real question is whether the combination of the companies was illegal in the beginning, or became so with the additions subsequently made."

And Judge Hook in his concurring opinion takes the same ground, saying (214 Fed. 1001):

"The International Harvester Company is not the result of the normal growth of the fair enterprise of an individual, a partnership, or a corporation. On the contrary, it was created by combining five great competing companies, which controlled more than 80 per cent. of the trade in necessary farm implements, and it still maintains a substantial dominance. That is the controlling fact; all else is detail. * * *

"It is but just, however, to say and to make it plain that in the main the business conduct of the company towards its competitors and the public has been honorable, clean, and fair. Some petty dishonesties were tracked in at the start, mostly by subordinates who had been in the service of the old

companies; but they were soon gotten rid of. In this connection it should also be said that specific charges of misconduct were made in the government's petition which found no warrant whatever in the proof. They were of such a character, and there was so much of them, apparently without foundation, that the case is exceptional in that particular."

Judge Sanborn dissented, on the ground that as the suit was in equity the court had no power to punish past violations of the Anti-Trust Act, but was only authorized to prevent and enjoin further acts violative thereof; taking the position that the question for decision was whether at the beginning of the suit in 1912 the Harvester Company was unreasonably restraining, or attempting to restrain or monopolize, interstate or foreign trade. In considering this question he laid stress upon the argument that the statute forbids such acts only as injure the public unduly in some of the following particulars:

"(1) Raising the prices to the consumers of the articles they affect;
"(2) Limiting their production;
"(3) Deteriorating their quality;
"(4) Decreasing the wages of the laborers and the prices of the materials required to produce them; or
"(5) Practicing unfair and oppressive treatment of competitors."

After reviewing the evidence, he came to the conclusion on the facts that for at least seven years before the suit was begun the defendant had not been injuring the public, either by unreasonably restricting competition, or by acquiring an undue share of the business, or by excluding other manufacturers or dealers, or by practices that were unjust or unfair or oppressive to competitors, or by raising prices to the consumer, or by limiting production of the articles manufactured, or by deteriorating the quality of such articles, or by decreasing the wages of labor, or by reducing prices of raw materials, and that the defendant was not threatening to do these things in the future. On the contrary, he found that the acts complained of by the government had had the opposite effect, and had resulted in benefit to competitors, to consumers, to laborers, and to the producers of raw materials.

With this difference of opinion in a strong and highly respected court, it may perhaps have some value if (with some hesitation) we add our own contribution to the discussion of this vastly important and much considered subject. We shall try to state our views briefly, although it may conduce to clearness if we outline the subject from the beginning.

[7, 8] The act of 1890 is directed against restraint of interstate or foreign trade; that is, against restraining the business of buying or selling for gain, whenever the transaction forms a part of commerce among the states or with foreign countries. Trade may be restrained —that is, hindered, or obstructed, or destroyed—in many ways and by many devices, but these are all covered by the first and second sections of the act. In these sections two classes of prohibited acts are described: (1) The concerted action of two or more persons, which may take the form of a contract, a combination in whatever form, or a conspiracy; and (2) monopoly, or the attempt to monopolize, which may be the act of one person alone, or of more than one. These two

classes are intended to be all-embracing, and thus far in the history of the statute no variety of device has escaped their sweep.

[9] In the usual meaning of the word, monopoly may be said to be the acquisition of something for one's self, and perhaps it would be applied most appropriately when the whole of a given trade is acquired. Practically, however, we need not contemplate so extreme a case of control or acquisition, and indeed the act itself is not primarily concerned with an offense so rare. The second section deals with the monopolizing, or the attempt at monopolizing, "any part" of the trade or commerce referred to; and it is clear enough, therefore, that Congress had chiefly in mind, not so much the monopoly of a whole (although the language might properly be construed to cover that also), as the much more likely case of the monopoly of a part smaller than the whole. But the question immediately arises: At what point does a business become so large that the statute condemns it? Or—to state the question in other words—is the mere size of a business enough to bring it within the disapproval of the act? Section 2 gives us no help, for "any" part, if strictly construed, might range from a minute and inconsiderable fraction to a part just less than the whole. If, therefore, a merchant, either an individual or a corporation, by the most commendable zeal and industry should succeed in diverting to himself a very small part of a competitor's business, he would be monopolizing a "part" of the trade, and would be condemned by the letter of the act. And in like manner, if the statute is using the strict meaning of "restraint of trade," no merchant could act in combination with his own partner in successful competition for part of a rival's business, even by the fairest and most honorable means, except at the risk of "restraining" trade. Further examples are needless; many more might be given. Clearly, therefore, as it seems to us, the act could not have been intended to bear a meaning so subversive; and it seems plain that the Supreme Court was abundantly justified in turning to the rule of reason, and in holding that of necessity Congress must have been dealing with undue or unreasonable restraints of trade, whether such restraints take the form of monopolies in whole or in part, or of concerted action under any guise whatever.

[5] But to say that a transaction is undue or unreasonable implies that it has been judged by a standard. The standard of course is reason, but various questions at once present themselves for answer. For example, who is to apply the standard? The legislation of Congress does not attempt the task itself, and under our system of government the duty must of necessity be undertaken by the courts, who must judge each case according to its own facts. But when such a question comes to be considered, where is a court to find the standard of reason? It seems to us that it must be found in the gradually accumulated results of general experience and observation, in the gathered wisdom of the community, for this is the product of a common and a prolonged effort by men who theorize and by practical men alike to deal as fairly, as justly, and as equitably as may be possible with situations that are often obscure and complicated, and of high importance to large classes and to many individuals. Obviously a standard

should have a true relation to the subject measured; and, since the inquiry here is whether in a given case trade is likely to be, or has actually been, unduly restrained, reason can answer the question only by going to the facts of life and drawing upon the accumulated store of knowledge.

Now, the world has already learned some lessons that have become part of its common stock. One of them is that, when men announce their intention in entering upon a given transaction, declaring it to be the accomplishment of a particular object, their declaration may usually be accepted as correct. Not always, of course, but as a rule; and especially is this true if the concealment of their intention would advance their interest. Let us suppose that several persons combine to do certain acts that may, or may not, have the effect of restraining trade. If they expressly declare their intention to be the restraint of trade, we shall hardly go wrong in believing them. And if such a situation be unlikely, a better illustration may be found in supposing that they agree to do the acts, but say nothing about their intention. In that event, if according to the common course of experience and observation the acts proposed will certainly have the result of restraining trade, their unexpressed intention will be of no consequence whatever; neither will it be of any consequence, if the reasonable probability be that trade will be restrained by the proposed conduct.

But another and ordinarily a better way of determining whether a course of conduct under examination is in restraint of trade is sometimes available, and that is by considering its actual effect. It goes without saying that such a test can only be applied after the course in question has actually been carried out in some degree, has actually been tried by experience; and this leads to the further question: When should the standard of reasonableness be applied? Evidently this will depend on the time when the question is submitted for decision. This time may either precede the proposed course of conduct, or it may follow the beginning of such a course so quickly that no body of experience, or no sufficient body, has yet come into existence. In that event the nature of things compels the court to enter the field of prophecy, or of probable anticipation. In such a situation, nothing else can be done. A court can only deal with the situations that are laid before it, and in the case supposed it must avail itself of whatever light may be had, and must exercise its best judgment with such aid as may be at hand. But, if the suit be deferred until the lapse of time and the actual effect of the conduct complained of have permitted facts to accumulate and have tried the project in question by the test of experience, we can hardly doubt that prophecy or probable anticipation should be considered inferior in force to the evidence of what has actually taken place. In this world we must do our best with the means at our disposal. Even if prophets are always in danger of being discredited by the event, we are sometimes compelled to speculate about the future; and our duty then is to check our speculations as much as possible by taking account of such probabilities as may arise from past experience and observation. In like manner, when we are face to face with what has actually happened, we may safely lay prophecy

aside, in order to accept the services of a better guide, one that can be relied upon with a firmer confidence.

[6] And this brings us to the next question, no matter at what point of time the inquiry may be undertaken, namely: What are the ordinary marks of such a course of conduct as may properly be condemned as a restraint of trade? Without attempting to enumerate them exhaustively, a few general observations may be made. Trade is restrained by putting hindrances in the way of the persons that conduct it. Whatever makes it more difficult for such persons to carry on their business restrains them, and restrains their trade; but (to speak generally) as every successful effort of a merchant to increase his own trade makes it harder for his rivals to succeed, and therefore restrains their trade, and as Congress certainly did not intend to condemn the proper exercise of business zeal and energy, we must recur to the rule of reason and ask—not merely what is restraint of trade, but what is unreasonable restraint of trade? On this subject we are certainly able to say some things with confidence. Competitors must not be oppressed or coerced; fraudulent or unfair or oppressive rivalry must not be pursued. And if these words are criticized as too general, we may reply that such generality is apparently unavoidable, as some recent legislation of Congress testifies, and, moreover, we may safely deny that the words are too vague for satisfactory use; for it must be remembered that the common agreement of moral opinion in the community furnishes an adequate guide to their practical meaning and their practical application. They are not likely to be misapprehended or misapplied. Then, too, prices must not be arbitrarily fixed or maintained. Ordinarily the play of the great forces that influence the market will determine prices, and these forces must be allowed to have their unhindered effect. And a corollary from this consideration is that an artificial scarcity must not be produced, since the effect of such a scarcity is to raise prices to the consumer. Moreover, the public is also injured if quality be impaired, so that the old price buys a worse article; and other injuries are done, if the wages of the laborer be arbitrarily reduced, and if the price of raw material be artificially depressed.

In the complexity of human affairs there may be other methods of unreasonably restraining trade, and these may be left for consideration as they are made to appear; but those already referred to are the methods that have usually been employed, and we need not enter the field of conjecture. Now, if all or some of these marks of unlawful restraint be present or may fairly be expected, the statute requires the application of an appropriate remedy; but if none of them be present, after sufficient experience has shown what will actually happen, on what satisfactory ground is condemnation to be pronounced? Not, we think, merely on the ground of size. As population has swelled, and as vast aggregations of men have multiplied their wants, the inevitable trend of modern affairs has called for large business enterprises, as well as for small; and we think it no more than reasonable to say that, when a large business has proved itself to be beneficial and not harmful to the community, it should not be condemned merely be-

cause it is large. We do not consider, and we do not deny, the right of a nation to adopt such a legislative policy in this respect as its constitution may permit; but, until a policy of limitation be so adopted, we see no possible test of reasonableness to be applied except such tests (and those like them) as have already been sufficiently referred to. And, from whichever side the subject may be approached—from the side of what is likely to happen, or from the side of actual experience—the standard of reasonableness should be applied according to the facts and circumstances of the particular case under examination.

As will no doubt be observed, we have already applied the rules we have been considering to the case in hand, and have expressed our opinion concerning the several acts of the defendant company that are attacked by the government, so that we need say nothing further except a word concerning the relief that should be granted. The defendant declares that the policy of boycott had been given up before the bill was filed—and there is some testimony to this effect—but the circular has never been withdrawn or negatived, and the company's resolution of January, 1910, has never been rescinded. We feel no hesitation in acting on the assumption that the policy was at least formally in force when the government began the suit now before us, and we have no doubt that an injunction should be granted. But we see no sufficient evidence that the public interest requires us to break up the existing corporate entity. U. S. v. Great Lakes Towing Co. (D. C.) 208 Fed. 746. The record satisfies us that the watch case business is not suffering from the absence of live and healthy competition, and except in the directions already mentioned—namely, the retail sales of the Howard watch, and the policy of boycott—we think the court is not called upon to interfere. But, in case conditions in the future should make it desirable for the government to ask for additional relief, even to the point of breaking up the defendant corporation, we shall retain jurisdiction of the bill, with leave to the government to take such action hereafter as may seem appropriate.

A decree may be drawn in accordance with this opinion.