**EASTMAN KODAK CO. et al. v. FEDERAL TRADE COMMISSION.**

(Circuit Court of Appeals, Second Circuit, May 18, 1925.)

No. 147.

**1. Trade-marks and trade-names and unfair competition ⊜67 — Act of company having substantially complete monopoly of sale of cinematograph film in entering on business of making pictures held not to constitute unfair competition.**

Act of company having substantially complete monopoly of sale of cinematograph film in United States, and having corporate power to do so, in equipping itself for or to enter on business of making pictures to meet competition from the importation and use of foreign raw film, etc., *held* not to constitute "unfair competition" within Federal Trade Commission Act, § 5 (Comp. St. § 8836e) and hence Federal Trade Commission unlawfully ordered company to divest itself of factories and laboratories so acquired.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

**2. Trade-marks and trade-names and unfair competition ⊜80½, New, vol. 8A Key-No. Series—Federal Trade Commission not a court.**

The Federal Trade Commission is not a court; it exercising administrative and not judicial power.

**3. Trade-marks and trade-names and unfair competition ⊜68 — Agreement of company with monopoly of sale of film to abstain from actual competition with picture makers, held to constitute "unfair competition."**

Act of company having substantially complete monopoly of sale of cinematograph film in United States, in agreeing with existing picture makers to abstain from active competition if latter would continue to buy American film, which combination was directly intended to keep foreign film out of the country, *held* to constitute "unfair competition," within Federal Trade Commission Act, § 5 (Comp. St. § 8836e).

Manton, Circuit Judge, dissenting in part.

Petition to Revise Order of the Federal Trade Commission.

Petition by the Eastman Kodak Company, Allied Laboratories Association, and others to review an order of the Federal Trade Commission. Order reversed in part, and affirmed in part.

This proceeding, brought by the Commission sua sponte, summoned as parties defendant the Kodak Company, a corporation of New York authorized by law to engage in any and all of the occupations hereinafter referred to, and Messrs. Eastman and Brulatour, citizens of New York, one the President of Kodak Company, and the other a man who for years had purchased and sold again most of Kodak Company's output of "raw film"; i. e., the material on which photographs are impressed, and which after such impression becomes a "moving picture." The other and quite numerous defendants were members of the Allied Laboratories Association, a corporation not organized for profit, and fairly described as a sort of trade union of persons and corporations for whom "raw film" was raw material, which was by them converted into "movie" film; i. e., something ready to be exhibited to paying audiences.

The complaint averred divers things about defendants which, "considered together, have a dangerous tendency unduly to hinder free competition in cinematograph films and prints of motion picture films [and to] constitute unfair methods of competition," within section 5 of the Federal Trade Commission Act (Comp. St. § 8836e). The exact allegations of complaint need not be recited, because no evidence was taken, and all facts are stated in a stipulation agreed upon; the sole source of the Commission's "findings of fact" is this stipulation.

We shall deal further with the findings in our opinion, but it was admitted that the Kodak Company made and long had made over 90 per cent. of all "raw film" used or made in the United States, and that of late its sales had been reduced in proportion by the importation and use of foreign raw film, German, French, and Belgian. Observing this, the Kodak Company acquired from Brulatour three factories suitable for making, out of any raw film, finished moving pictures, and then let it be known that it was itself about to enter into competition with picture makers as a picture maker, a kind of work it had never before done or attempted. But it was willing to agree, and did agree, with the Allied Laboratories As-

sociation or its members, that if they would refrain from buying foreign raw film, and would continue buying domestic film to make pictures on, it (Kodak Company) would refrain from entering the picture-making field, though maintaining its newly acquired factories ready for instant operation.

This situation the Commission visited with the order complained of, which required all the defendants to "cease and desist from conspiring," etc., to (1) "hinder and restrain competition in the manufacture and sale of positive raw cinematograph film stock" and (2) to "maintain and extend the monopoly of the Eastman Kodak Company in the distribution and sale of positive raw cinematograph film stock in interstate and foreign commerce."

The specific acts from which cessation is ordered are (1) the acquisition of equipment of the laboratories acquired by Eastman Company from Brulatour "for the purpose of extending its business"; (2) the use by Kodak Company of said laboratories to "induce, compel, and coerce" other defendant laboratories to use "exclusively American-made positive raw" film stock; (3 and 4) the agreement between defendants, by which Kodak Company refrains from operating its factories as long as the laboratories refrain from buying foreign stock; (5) the act of Kodak Company in owning the laboratories acquired from Brulatour; (6) any other, though unspecified, "equivalent means" of "unfairly" restraining "the manufacture and sale" of raw film stock in interstate and foreign commerce. Then by a special clause of the order Eastman Kodak Company is required to sell the laboratories procured from Brulatour to some one "not connected directly or indirectly in interest" with itself.

This order the Kodak Company, Eastman, and Brulatour seek to review by one petition, and certain of the Allied Laboratories by another.

Hubbell, Taylor, Goodwin & Moser, of Rochester, N. Y. (John W. Davis and Frank L. Crawford, both of New York City, and Clarence P. Moser, of Rochester, N. Y., of counsel), for petitioner Eastman Kodak Co.

Geoffrey Konta, of New York City, for Brulatour.

M. H. Lavenstein, of New York City, for certain of the Allied Laboratories.

W. H. Fuller and Wm. A. Sweet, both of Washington, D. C., for the Trade Commission.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). Making fact findings is often an invidious task; but, where the facts are agreed upon, the difficulties would seem to be removed by consent. The Commission's findings in this case, often confound a finding (i. e., a statement of some proved fact) with a conclusion (i. e., an inference drawn from the facts proved); but the matter is not here important, because a reference to the agreed facts at once enables one to separate the Commission's color for the facts from the dry facts themselves.

The fact, or inference from facts (it makes no difference what it is called), deemed of most importance by the Commission is that Eastman Kodak Company in 1921 had a "substantially complete monopoly of the sale of positive and negative cinematograph film in the United States." This is true, but the reasons are just as true, viz., that the company was the first American manufacturer, had pushed its trade with skill, and made what is still regarded as the best raw film anywhere obtainable.

The Commission then proceeds to take what it calls "judicial notice" of United States v. Eastman Co. (D. C.) 226 F. 62, and declares that the company's action in holding the factories or laboratories acquired from Brulatour ready for action, should the other and defendant laboratories dare to use foreign film, is "analogous" to what the courts condemned in the case "judicially" noticed. Whether any analogy exists is a matter about which opinion may differ, but the matter is unimportant, unless the fact that a company has violated the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) is evidence that it has also violated the Federal Trade Commission statute, which is not true.

Next, the Commission, having established a monopoly and suggested a motive, infers a purpose to continue the monopoly, and declares that defendants' acts as recited constitute a combination in restraint of trade having results which are frustrated by the order as above set forth.

It is first to be noted that what the Commission has done must be justified under the Trade Commission Act, if at all. The Clayton Act cannot be appealed to; the complaint, findings, and order all rest solely on the fifth section of the act creating the Commission—i. e., what petitioning defend-

ants have admittedly done amounts to an unfair method of competition.

Next, the inquiry is vital: In what trade or commerce is an unfair method of competition encountered? Here the Commission's "conclusions of fact" are plain; it is "the sale of positive cinematograph film in interstate and foreign commerce," although additional sin is found in that the acts prescribed also "tend materially to sustain the monopoly already existing in the Eastman Kodak Company."

Having thus delimited the law chosen by the Commission to apply to the facts found, it is plain that what it all amounts to is this: One who, by early arrival in the field, excellence of product, and marketing skill, makes and sells over 90 per cent. of the native raw material, has no legal right to embark on the new business of finishing his own raw material. This is the first half of what has been done, and half of the proposition laid down by the Commission. The other half is this: If two sets of men are equipped to make pictures and one of them is equipped also to make raw film, it is unlawful for them to agree to divide the field of business, so that the raw film maker shall make all the film, and the other men shall make all the pictures.

[1] With the first proposition we do not agree, and hold that, since corporate power exists, it was not and is not unlawful for Eastman Kodak Company to equip itself for or to enter upon the business of making pictures; but it was and is unlawful for the Commission to order that company to divest itself of the factories or laboratories so lawfully acquired.

[2] The Commission is not a court; it exercises administrative, not judicial, power (National Harness, etc., Ass'n v. Federal Trade Commission [C. C. A.] 268 F. 705; Chamber of Commerce v. Federal Trade Commission [C. C. A.] 280 F. 45), and no statutory grant can be found justifying the order that a citizen sell property acquired in the course of business.

But, even if the Commission had the powers of a court, as exercised in the cases relied on (Standard Oil v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663), there was no basis for exercise of power. The sole object of Commission action was to prevent unfair competition, but there was nothing unfair in the Kodak Company going into the business of making pictures; on the contrary, it is fundamental just now in this country that competition is holy; the more we have, the better presumably are we off; wherefore the act of getting ready to compete in the picture-making art was under our statutes positively meritorious, and no court could have prevented what was done.

[3] But quite different was the act of agreeing with existing picture makers to abstain from actual competition, if the latter would continue to buy American film. This was a combination directly intended to keep foreign film out of the country, and the Federal Trade Commission was authorized to do what it has done, and take up the cudgels for the foreigner. If the agreement had been that Kodak Company would refrain from competition in the picture-making field, if existing picture makers would refrain from purchasing raw film from Kodak's *American* rivals, the matter would have been plainer; but we are of opinion that the Commission, if it deemed its action for the public interest, could promote the interests of foreign raw film makers, as has been done. The Commission's field of action is foreign as well as interstate commerce.

Result is that the order under review is reversed, in so far as it calls upon Eastman Kodak Company to cease and desist from owning the factories obtained by it from Brulatour, but upheld so far as it requires all parties to cease and desist from acting in agreement to refrain from operating the Brulatour factories as long as foreign film is not purchased by existing defendant factories.

Settle exact form of modified order on notice, and in the first instance before the judge writing this opinion.

MANTON, Circuit Judge (dissenting in part). I agree with the conclusion of Judge HOUGH'S opinion which results in affirming that part of the order requiring the Eastman Kodak Company to cease and desist from acting in or carrying out the agreement with the operators to refrain from operating the laboratories known as the Paragon, the G. M., and the Sen Jacq Laboratories, as long as foreign films are not purchased by the existing defendant laboratories. The order to cease and desist provides against the use by the Eastman Kodak Company or the ownership and possession of said Paragon, G. M., and Sen Jacq Laboratories and their equipment and capacity for producing positive prints of cinematograph films from exposed and developed cinemato-

graph films to induce, compel, and coerce the Allied Film Laboratories Association, Inc., and its members, to use in their laboratories, for the manufacture of positive prints of cinematograph films, exclusively American-made positive raw cinematograph film stock, of which the Eastman Kodak Company has a monopoly in the manufacture and sale. American-made positive film was Eastman's, because at this time it controlled 96 per cent. of the negative film product.

The order further recites that: "The continued ownership by the Eastman Kodak Company of the Paragon, G. M., and Sen Jacq Laboratories, and the maintenance of the same in readiness for immediate operation for the production of positive prints of cinematograph films, or any other dominant control of the production, or capacity for production, of positive prints of cinematograph films from exposed negative cinematogaph films." And: "Utilizing any other equivalent means, not hereinbefore stated, to accomplish the object of unfairly forestalling, preventing, hindering, or restraining the manufacture and sale of positive raw cinematograph film stock and the making of positive prints of cinematograph films from exposed negative cinematograph films, or the sale thereof, in interstate and foreign commerce." And, further, "that for the purpose of preventing the maintenance and extension of the monopoly of the Eastman Kodak Company in the manufacture and sale of positive raw cinematograph film stock to the use thereof in making positive prints of cinematograph films, and of restoring competitive freedom in the distribution and sale of positive raw cinematograph film stock, the Eastman Kodak Company shall, with all due diligence, sell and convey the said Paragon, G. M., and Sen Jacq Laboratories to parties not connected directly or indirectly in interest with the Eastman Kodak Company."

The facts found point out that the reason the direction "to sell and convey with due diligence" the laboratories which it had purchased is founded upon the conclusion that the purchase of the laboratories wherein positive films were to be manufactured, was with the idea of using them as a means to restrain competition in the manufacture and sale of raw positive film. There is justification for this conclusion. In 1921 the Eastman Company and Brulatour, who was associated with it, as stated in the prevailing opinion, conceived the idea of having the Eastman Company acquire these laboratories, which were equipped or were being

equipped to manufacture prints of motion picture films, and which had a capacity greater than the combined capacity of all the laboratories east of Chicago which were engaged in similar business. After negotiations were concluded, and the transfer of the property made, the Eastman Company published in the trade papers the announcement of such acquisition and its intention to operate the same. The reason therefor was frankly stated to be that they were acquired for operation because of the rapidly increasing importation of foreign film. The purpose was to eliminate from the market the foreign film, and this was to be accomplished by coercion, and to compel the users thereof—that is to say, the laboratories engaged in manufacturing prints—to use the Eastman Company film. This would maintain or tend to maintain the 96 per cent. control or monopoly of the business which the Eastman Company already had. It was selling over 500,000,000 feet of film annually, and it was then that it began to use the phrase "American-made films."

It was easy to compel the independent laboratories to surrender to the plan of purchasing from the Eastman Company, when there was constantly hanging over them the dread of the Eastman Company operating these purchased laboratories, which would put upon the market what was to be a gigantic production. The control of the negative film was then absolutely in the hands of the Eastman Company. The negative film was used by the producers of motion pictures, and they could get it from no one else than the Eastman Company and through Mr. Brulatour. The making of prints of motion pictures from negatives in which the laboratories were engaged was the business obtained from these producers. Since the Eastman Company controlled the production of the negative film, the producers could be greatly influenced by having their laboratory work done by the laboratories of the Eastman Company. The acquisition of these properties and the anounced intention of operating the laboratories was nothing short of a threat, and therefore a means of coercing the purchase from it of film, and this, coupled with the agreement entered into to exclude foreign competition, insured the success of their effort, which amounted to a restraint of trade.

It is significant that as long as the agreement was kept the laboratories were not operated, and as long as there was this threat to operate, and thus to become a potential

competitor, the ease with which they might coerce the action of the other petitioners in their purchase is plain. The result was a protest which was published in the trade journals in the form of a statement on August 26, 1921. It was after this statement that a conference took place between the Eastman Company, Brulatour, and the representatives of the laboratories, whereof Mr. Brulatour wrote on September 8th to the Eastman Company: "It will please you to know we are having daily conferences with the laboratory people, and that they are very enthusiastic, and that things are taking a very nice course."

On September 9, 1921, the laboratory owners, having formed the Allied Film Laboratory, Inc., entered into the agreement to use American-made raw film stock exclusively, which was in effect the Eastman Company's product. It is this agreement which caused the Trade Commission to issue its order to cease and desist its being carried out. On September 14, 1921, the Eastman Company wrote a letter to the members of the association in which it agreed not to operate the laboratories it purchased commercially so long as the members adhered to the agreement to use only American-made film stock, and agreed to co-operate with said members "to protect them against any invasion of foreign raw film stock." This undoubtedly took away the right of independent action by the laboratories and created at least a tendency unduly to hinder competition.

The binding force of this agreement is pointed out in the letter of Mr. Blair of the Eastman Company to Mr. Brulatour, in which he wrote: "I don't know the reason for the statement made by Mr. Rothacker that the Allied Laboratories were permitted to use 5 per cent. of foreign film; at any rate Mr. Rothacker said that Harry Goetz had told him this was the case, and, as you know, this is entirely contrary to the agreement." To which Mr. Brulatour answered: "He is absolutely wrong about this; it was not in the agreement."

On February 28th, the Eastman Company wrote a letter to the association, releasing the laboratories from the obligation to use only American-made film, and stated: "Whether we open for operation the laboratories which we control, or not, will not depend in any way upon the action of the members of your association with respect to the kind of film used in their laboratories."

This note indicates that the Eastman Company had kept its part of the agreement not to operate the laboratories. They also inspected or caused to be inspected the laboratories of the members of the association to be made, to ascertain whether or not they were using any foreign manufactured film. It is evident that these laboratories were equipped and never operated, but were maintained in readiness for operation for this purpose only. It was not the purchase of the laboratories with an idea of extending its business in the manufacture or carrying on the manufacture of raw positive film, but was used as a powerful club by which the business of the members of the association would be diminished or destroyed in case the agreement was violated.

Both the purchase and holding of the laboratories in the manner described, coupled with the agreement entered into, was such action as amounted to a hindrance with free competition if, indeed, it did not create a monopoly. United States v. Eastman (D. C.) 226 F. 62. When men deliberately and intelligently go to work and acquire power that enables them to control the market, if they choose to exercise it, it is no use for them to say that they did not intend to control the trade or limit competition. United States v. Internatl. Harvester Co. (D. C.) 214 F. 987. "If the power given by the volume of a particular business is improperly used to injure either a competitor or the public, or if such power evidently tends toward the injury of either, the mischief either done or threatened is condemned by the statute." United States v. Keystone Watch Case Co. (D. C.) 218 F. 502.

The Clayton Act was intended to render unlawful practices not theretofore held to be violations of the Sherman Law. Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653. The function of the Commission is to preserve competition and protect competitive business from further inroads by monopoly by preventing the use of unfair methods of competition before any act should be done or condition arise violative of the Anti-Trust Act. Federal Trade Commission v. Beechnut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882. While the Commission is not a court, and exercises no judicial power, it has the power in the proper case to order a respondent to dispose of property acquired by it which it is found using as a means to unfair competition in trade. Indeed, it may order the disposing of the plant or property which it uses in part or whole in creating a monopoly. Federal Trade Commission v. Thatcher, 5 F. (2d) 615, decided April, 1925 (C. C. A. 3).

The Commission's jurisdiction extends over matters of foreign as well as interstate commerce, and in the public interest it may deal with matters of foreign trade, where agreements are made, such as here, which restrict competition. By this action it may incidentally assist foreign trade. But, since it is lawful that there may be importation of foreign film, it became the duty of the Commission to direct the cessation of interference with such competition. Congress alone has the power to prohibit or restrict it. It may deem such a policy in public interest, and it may do so by a tariff barrier or otherwise; but, while this freedom of trade exists, the performance of duty demanded action by the Commission to prevent the interference or attempted interference by this petitioner.

The order should be affirmed in all its directions.