## UNITED STATES v. EASTMAN KODAK CO. et al.

(District Court, W. D. New York. August 24, 1915.)

No. A–51.

1. MONOPOLIES ⊕⫸12—ANTI-TRUST ACT—COMBINATIONS IN RESTRAINT OF TRADE.

The Eastman Kodak Company, of New York, a corporation engaged in the manufacture and sale of photographic apparatus and supplies, including cameras, plates, films, and paper, in the course of some 15 years acquired the ownership of the property and business of about 20 competing concerns throughout the country, whose plants were dismantled and the business discontinued or transferred to its own plants. If corporations, they were for the most part dissolved, and their officers, or the partners, in case of firms, bound by contract not to engage in competing business for terms of from 5 to 20 years. It also by contract with the makers obtained entire control in the United States of the imported raw paper which was recognized as the only standard paper for the manufacture of photographic printing-out paper, and by refusing to sell to other manufacturers compelled several competing companies to sell or go out of business. It acquired stock houses in the larger cities, which handled chiefly its own products, and by contracts with other dealers to

whom it sold fixed resale prices and required them to sell its goods exclusively. By such means it secured control of from 75 to 80 per cent. of the entire interstate trade in the articles in which it dealt. *Held*, that such methods were intended and calculated to, and did, result in an undue and unreasonable restraint of interstate trade, and in securing to the Eastman Company a "monopoly" of a part thereof, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⊂⊐12.

For other definitions, see Words and Phrases, First and Second Series, Monopoly.]

2. MONOPOLIES ⊂⊐12—ACTS IN RESTRAINT OF TRADE—ARBITRARY USE OF POWER RESULTING FROM LARGE BUSINESS.

While the size of a corporation and the extent of its business do not alone constitute an illegal monopoly, they may properly be considered when its acquisitions of property are accomplished by methods showing an intention to monopolize and restrain interstate trade, and by an arbitrary use of power resulting from a large business to eliminate weaker competitors.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⊂⊐12.]

In Equity. Suit by the United States against the Eastman Kodak Company, a corporation of New Jersey, the Eastman Kodak Company, a corporation of New York, George Eastman, Henry A. Strong, Walter S. Hubbell, and Frank S. Noble. On final hearing. Decree for complainant.

John Lord O'Brian, U. S. Atty., of Buffalo, N. Y., and Mark Hyman, Sp. Asst. Atty. Gen., for the United States.

Philipp, Sawyer, Rice & Kennedy, of New York City (James J. Kennedy and William S. Gregg, both of New York City, and S. Wallace Dempsey, of Lockport, N. Y., of counsel), for defendants.

HAZEL, District Judge. This is a bill in equity brought by the United States Attorney for the Western district of New York under the direction of the Attorney General against the Eastman Kodak Company, a corporation of New Jersey, the Eastman Kodak Company, a corporation of New York, George Eastman, Henry A. Strong, Walter S. Hubbell, and Frank S. Noble, to restrain the violation of the Sherman Anti-Trust Act. The Eastman Kodak Company of New Jersey, which was organized in the year 1901 with a capital of $35,-000,000 is owner of the capital stock of the Eastman Kodak Company of New York, a corporation engaged in the manufacture of photographic materials and supplies, and of two other corporations, one English and one Canadian, similarly engaged. The individual defendants are officers and directors of the defendant corporations, and together they are charged with having entered into contracts and combinations in restraint of interstate trade and commerce, and with monopolizing a part of such trade.

The bill alleges substantially that during the years from 1902 to 1906 the principal defendant, the New York corporation, intentionally mo-

nopolized the business of manufacturing and selling cameras, plates, photographic paper, and film in the United States, by acquiring the capital stock, property, plants, patents, and good will of about 20 competing companies, which were afterwards dissolved, the plants dismantled, and their businesses absorbed or removed to Rochester, N. Y.; that the Eastman Kodak Company of New Jersey acquired by purchase many stock houses engaged in different states in selling photographic supplies manufactured by defendants and their competitors; that the defendants, with the intention of monopolizing the importation thereof, acquired the exclusive right to sell in the United States and Canada raw paper stock from European paper mills, a necessity in the manufacture of photographic papers; that they also acquired by purchase a substantial part of the dry plate industry throughout the United States, and monopolized the manufacture and sale of photographic film; that from 1899 to 1908 all photographic supplies manufactured by the Eastman Kodak Company were sold by dealers under restrictions forbidding them to handle or sell the articles of competitors and fixing the sales prices, such restrictions being enforced by the payment of special discounts to dealers observing them, thus stifling competition. It is also alleged that such special discounts were discontinued in the year 1908, but that subsequently so-called terms of sale were adopted containing conditions that dealers carry only such materials for sale to customers as were sold to them by the Eastman Kodak Company at listed prices, and that no articles were to be consigned by them to others without first obtaining the permission of the manufacturing company. It was also provided in the terms of sale that the articles sold to dealers should not be sold by them to other dealers, and furthermore that the sale by them of specified patented articles in violation of the conditions of sale would entail a revocation of the right to deal in any of the Eastman commodities. By the acquisition of properties and the enforcement of said terms of sale the defendants, according to the bill, acquired the largest percentage of the trade in photographic materials, unlawfully restrained such trade, and obtained an illegal monopoly thereof. The relief prayed is a dissolution of the defendant companies, and a disintegration of their business.

The defendants deny restraining trade or competition, or engaging in a monopoly, and asseverate that their status in the business of manufacturing and selling photographic supplies was a result solely of the creation and development within their plants of products of a superior quality, and of the manufacture of a type of camera in which it was the conceded pioneer.

The testimony in this case, which is one of much public importance, was taken before me at different times, and the case was fully argued on both sides by skilled and able counsel. The record comprises upwards of 3,000 printed pages of testimony and three volumes of printed exhibits. The trial has been ingenuously and fairly conducted, without resort to technical objections to testimony, and without endeavor to conceal any of the acts claimed by the government to have been wrongful, and by the defendants to have resulted from the in-

generate growth of the business or to have been necessary to its proper development. Although there is little, if any, conflicting evidence, the different inferences drawn by the litigants, even from the conceded facts, are so divergent that it is not without difficulty that the conclusions hereinafter set forth have been reached. Nor was it an easy task to apply the facts to the law, as the many adjudications cited in the briefs for my guidance are thought to be differentiable, necessitating a determination of this case upon the peculiar facts and circumstances presented, and requiring me to ascertain whether they come within the prohibitions of the Sherman Act as construed by the Supreme Court of the United States in Standard Oil Company v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and in United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, and whether the standard of reason rule emphasized in such decisions requires a holding that the defendants were simply beneficiaries of the natural expansion of the photographic art and the business of manufacturing and selling photographic materials, or of the conspicuous skill, industry, and sagacity of Mr. Eastman, who organized the Eastman Kodak Company, and whether the merging of the various enterprises was merely supplementary to an established business first in the field, and not for the purpose of protecting it, or whether, indeed, the defendants are guilty of forming a conspiracy or device to corral or concentrate the business, with a view to monopolizing interstate trade or commerce by the adaptation of unfair methods which tended to, and did, diminish or destroy the business of their competitors.

If the contracts between the Eastman Kodak Company and others, and the acquisitions of property complained of under the evidence, eventuated in an undue and unreasonable engrossment of trade, then without doubt, the act in question has been violated, and the government may resort to the courts to suppress such violations. Monopolies are created in various ways, and may constitute partial restraints of trade which of themselves are not unreasonable, and contracts or combinations creating them are not necessarily invalid. The statute prohibits only such monopolies as are unjust and unreasonable restraints of trade. In Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232, the Supreme Court, referring to the Standard Oil and Tobacco Company Cases, said:

"Those cases may be taken to have established that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

Section 1 of the Sherman Act specifies restraint of trade by contracts, combinations, or conspiracies, while section 2 specifies monopolization or attempted monopolization, of any part of the trade or commerce among the states by combinations or conspiracies. In its lucid construction of this statute the Supreme Court in the Standard Oil Case included equally restraint of trade or monopoly, either by a corporation or combination of corporations, or by an individual or combination of individuals, as falling within the prohibition; and what-

ever indefiniteness exists in the text of the act is obviated by the language of Chief Justice White, who said:

"The ambiguity, if any, is involved in determining what is intended by monopolize. But this ambiguity is readily dispelled in the light of the previous history of the law of restraint of trade to which we have referred and the indication which it gives of the practical evolution by which monopoly and the acts which produce the same result as monopoly, that is, an undue restraint of the course of trade, all came to be spoken of as, and to be indeed synonymous with, restraint of trade. In other words, having by the first section forbidden all means of monopolizing trade, that is, unduly restraining it by means of every contract, combination, etc., the second section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be not embraced within the general enumeration of the first section."

And in United States v. Union Pacific R. R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124, the Supreme Court said:

"The act is intended to reach combinations and conspiracies which restrain freedom of action in interstate trade and commerce and unduly suppress or restrict the play of competition in the conduct thereof"

—and recognized that a single dominating control in one corporation, whereby natural competition in interstate trade was suppressed, was violative of the statute.

In the recently decided case of United States v. Keystone Watch Case Co. (D. C.) 218 Fed. 502, Judge McPherson, after analyzing sections 1 and 2 as construed by the Supreme Court in the Standard Oil Case, said:

"To fall within the prohibitions of the statute it is necessary that the unlawful restraint of trade—and this is not always the same thing as the mere restraint of competition—should be direct, and not merely incidental, and should also be undue or unreasonable. If it be both direct and undue, no disguise will save it; courts will search for the substance and the actual effect of the transaction, and, if trade be unlawfully restrained thereby, will grant the needful relief. There are many methods by which trade may be unduly restrained, and among these are contracts and combinations to fix and maintain prices, or to boycott the goods of a manufacturer or other dealer."

With this view of the law I am in entire accord. It makes no difference that the defendant corporations and the individual defendants were not in fact competitors or rivals in business, or separate entities; the government does not rely upon a combination in restraint of trade, but attaches importance to contracts entered into with manufacturers of raw paper, to the acquisition or absorption of the business of competitors, and to sales price restrictions and other unfair conditions imposed upon dealers.

[1] The proofs are that in 1878 the defendant George Eastman entered the field of photography, organizing a small company for the manufacture and sale of wet collodion plates for the making of negatives. This process, which was practiced exclusively by professional photographers, consisted of coating a sheet of glass with iodized collodion and then immersing it in a solution of nitrate of silver to sensitize it and prepare it for exposure in a view camera. Later he

abandoned the wet collodion process, and having organized the East-man Dry Plate & Film Company—the predecessor of the Eastman Kodak Company—began the manufacture of dry plates, adapting there-to the so-called gelatino-bromide of silver emulsion. This was a radical departure from the earlier process, making it possible to pre-pare plates in advance and rendering it unnecessary to develop them immediately after taking the pictures. While this was a decided ad-vantage, it was nevertheless still necessary to carry into the field for outdoor photography a somewhat heavy camera, with its tripod, glass plates, and plate holder, making photography too burdensome to attract many amateurs. The film roll system of photography was then unknown. The printing-out paper used for making positives was an albumen paper coated with chloride and suitably sensitized, but was usable only for taking pictures by daylight. When the dry plates appeared on the market, manufacturers of cameras began to use them in connection with smaller and lighter view cameras, and a few hand cameras were produced by Scoville & Adams Company and by Anthony, including the Favorite, Waterbury, Bicyclist—so-called detective cam-eras, which, however, were regarded as novelties, and used only to a limited extent, disappearing from the market in 1894.

Between 1881 and 1884 Mr. Eastman, assisted by one Walker, ex-perimented with photographic paper, a roll-holder mechanism, and film for use therewith. As a result of such experiments two patents, No. 317,049 and No. 317,050, were granted them on May 5, 1885, for roll-holder mechanism, enabling the unwinding of a paper film from one roll and winding it on another to expose different portions of it in the focal plane of the camera. In 1885 the Eastman Company began making machine coated paper, and patents were granted cover-ing the process and apparatus. By such process was produced a uni-formly coated photographic paper, in the web or in strips, for adap-tation to the film roll system of photography—something greatly de-sired in the art. In 1884 patent No. 306,594 was granted to Eastman for a stripping paper film coated with gelatine emulsion, which could be laid, after exposure, upon a glass plate, and the negative film re-moved by moistening, without its adhering to the glass plate from which the picture was printed. At this time there were comparatively few amateur photographers, as that term is accepted in the art, and it was expected that the roll holder and stripping film would greatly increase their number; but such did not prove to be the fact, their only use being by professional photographers as supplementary to the plate camera.

In June, 1888, Eastman produced a camera (patent No. 388,850) which he arbitrarily called a Kodak, consisting of an oblong box, $6\frac{1}{2}$ inches in length, $3\frac{1}{4}$ inches in width, and $3\frac{3}{4}$ inches high, weighing $1\frac{1}{2}$ pounds, and capable of 100 exposures. He employed a shutter de-vice in connection with it, which was operated by pulling a string and pressing a button; the film being turned by a key to bring it into proper exposure. The Kodak was well received by the general public.

Mr. Eastman then experimented to produce an improved film, one that would remove the necessity of stripping the paper base from

the gelatine negative of the film—a difficult operation, undertaken only by the skilled photographer. Such experiments resulted in the substitution in the early part of 1889 of a nitro-cellulose transparent film or pellicle for the stripping paper film, for which patents No. 417,202, dated December 10, 1889, and No. 479,305, dated July 19, 1892, were granted to one Reichenbach, an employé, for the process, and patent No. 471,469, dated March 22, 1892, was granted Mr. Eastman for the apparatus. Although Hannibal Goodwin was the original inventor of the nitro-cellulose film or pellicle for use in connection with roll holder cameras, as decided in Goodwin Film & Camera Co. v. Eastman Kodak Co. (D. C.) 207 Fed. 351, the Eastman Kodak Company was nevertheless the first to commercially use such film, and was generally accredited with being its originator. Its substitution for glass plates or stripping paper films, as indicated by laudatory articles in photographic almanacs and other publications devoted to photography, practically revolutionized the photographic art and immeasurably simplified the use of the camera.

In about the year 1895 there was invented by one Turner a photographic film roll or a so-called daylight loading cartridge (patent No. 539,713), which did away with the necessity of loading the camera in a dark room as was previously required. In 1897 a patent was granted to Eastman on an application filed by one Brownell May 11, 1895, for a pocket Kodak in which the film rolls were arranged in front of the focal lens—a departure from the earlier A. B. C. camera manufactured by the Eastman Company, in which the film rolls were arranged in the rear of the focal plane, a feature also described in the Houston patents, No. 526,445 and No. 526,446, dated September 25, 1894, which were later acquired by the Eastman Kodak Company. A camera called the Bullett, also having the film roll in front of the focal plane, was marketed by the Eastman Company in the year 1895, and was followed by a folding pocket Kodak and a Brownie camera, in which classes of film roll cameras the said company claims to have been the pioneer.

Whether the defendant Eastman or the companies organized by him are entitled to be accredited with being the first to simplify the use of the film roll camera is questioned; the government claiming that the invention of the dry plates was in fact the beginning of amateur photography, that impetus was afterward given thereto by the introduction of various small hand plate cameras, and that later, about the year 1894, the Bullseye camera marketed by Blair & Turner revolutionized film photography. Evidence was given to show that from 1892 to 1894 sales of the Kodak, introduced by the Eastman Company in 1888, were steadily decreasing; it being pointed out that in 1892 the sales of Kodaks and apparatus amounted to $207,212.51, and in 1894 to $74,594.33, while the sale of films amounted to $102,404.29 in 1892 and to $81,319.48 in 1894, which decrease the government attributed to the competition created by the appearance in the market of the Bullseye camera. It is shown that suits for infringement of the Walker & Eastman roll holder patents were instituted against Blair & Turner, and a preliminary injunction obtained, which was after-

wards vacated; but that improvements in the camera were made by Turner, Houston, and others does not in my opinion change the fact that Walker and Eastman first solved the problem of the film roll camera by producing the roll holder to which reference has hereinbefore been made.

However that may be, in the years 1895, 1898, and 1899, the Eastman Kodak Company acquired the businesses of the Boston Camera Manufacturing Company, the American Camera Manufacturing Company, and the Blair Camera Company, including their plants, properties, secret formulæ, and trade-marks, entered into contracts with foreign raw paper concerns with regard to the importation of raw paper into the United States, and acquired plate camera and sensitized photographic paper concerns, the card stock business of Taprell, Loomis & Co., and 15 stock houses, and also imposed restrictions on dealers to the retail trade with regard to price, etc. For the sake of convenience these transactions, alleged in the bill to have been illegal acts, will be separately taken up.

In June, 1895, a license was granted the Eastman Kodak Company to make cameras under Turner patent No. 539,713 for a film roll, which patent, on August 10, 1895, was sold to the Eastman Company, together with the business of the Boston Camera Manufacturing Company, conducted by Turner and one Blair, for the inventory price plus $35,000, which was, however, by agreement subsequently reduced to $22,000; Turner agreeing in the conveyance that for a period of 5 years he would not engage in the manufacture or sale of cameras or articles used in connection therewith, within the states and territories of the United States or within the District of Columbia. Blair was in Europe when his partner, Turner, sold the business; but, if this gave cause for criticism, it is not of importance in the present proceeding. It was contended by the government that the sale by Turner was coercive, that it was made owing to the annoyance of the pending infringement suit, which it is claimed was brought in accordance with a preconceived plan to secure a monopoly; but the evidence is insufficient to support this view. The action was not illegal, and the parties had a right to compose their differences by a settlement involving transfers of property. Virtue v. Creamery Package Company, 227 U. S. 8, 33 Sup. Ct. 202, 57 L. Ed. 393.

In 1898 the Eastman Kodak Company acquired the business of the American Camera Manufacturing Company, organized a number of years previously by the witness Blair, with a capital of $25,000, to manufacture the Buckeye film camera—a camera similar to the Bullseye and embodying the Houston patent for placing the spool film in front of the focal plane. Prior to the sale Blair asserted that the Eastman Company infringed the Buckeye camera by using the Houston adaptation, while the Eastman Company, claiming that the American Camera Manufacturing Company infringed its roll holder patents, brought a suit to restrain infringement; but before hearing the properties of the American Camera Manufacturing Company were taken over by the Eastman Company, Blair consenting to remain in its employ and agreeing not to engage on his own account in the manu-

facture of cameras or photographic supplies in the United States or the District of Columbia for a period of 5 years. It was also agreed that Blair should assist the Eastman Company to acquire the Houston patents, and that if successful he should receive for his services $15,000. He succeeded in getting such an assignment, together with a release of the Eastman Company from liability for past infringements.

The evidence shows that Blair continued the operation of the American Camera Manufacturing Company plant as subsidiary to the Eastman Company for a short time, transacting a fair amount of business, but that the plant was nevertheless dismantled by the Eastman Company and the machinery and materials moved to Rochester, with the result that the manufacture and sale of the Buckeye camera was practically discontinued. Mr. Eastman stated with candor that the purchase of the plant was merely incidental to the primary object of acquiring the Houston patents, which were regarded as of great value. No threats were made to induce Blair to make the sale, and, while he testified that he was influenced to this end by the pending infringement suit, such suit, in my opinion, was not maliciously brought, and no unfair advantage was taken of him, as a concededly liberal price was paid for the capital stock of the company. Nor does any question of unfair treatment of E. & H. T. Anthony & Co., licensees of the American Camera Manufacturing Company, under the Houston patent, arise, for the Eastman Company, after acquiring such patent, permitted the licensees to continue manufacturing thereunder without fixing the selling price of the cameras.

In 1899 the Blair Camera Company, also organized by Mr. Blair a number of years previously, was acquired by the Eastman Kodak Company. At this time, however, Blair was not connected with the company; the principal owner being one Goff who solicited Mr. Eastman to buy the business. At the time of the sale the Blair Camera Company was making the Hawkeye film camera, the base for its film being supplied by the Celluloid Company, and was the owner of the Crane patents, No. 549,231 and No. 549,232 for improved roll holders employing black paper at each end of a perforated film. Mr. Eastman gave as a reason for acquiring the Blair Camera Company that he wished to acquire the Crane patents, as he believed it might be possible to develop by their adaptation a better method for exposing film, and also that prior to such purchase the Blair Camera Company was infringing the Houston patents. However, whatever the reason may have been, the purchase was not illegal; and in the absence of any unfair practices in the acquisition of such property I am disinclined to hold that there was anything wrongful in such transaction, or in any of the transactions by which the three specified companies were acquired. Up to this time the evidence fails to show anything unlawful in the operations of the Eastman Kodak Company; but it did not stop there, and it can scarcely be doubted that such acquisitions were the nucleus from which arose the intention to bring other companies manufacturing and dealing in photographic supplies under its control. Its commodities were extensively advertised, and its business

grew rapidly, necessitating numerous additions to its manufacturing plants at Rochester at different times, beginning in 1890. Improvements were constantly being made in cameras, and the increasing simplicity with which they were operated rapidly increased the number of amateur photographers.

Modern photography is not dependent alone upon the camera for its success, but also upon the character of the raw paper used for what is technically known as printing-out paper. To produce good results the raw stock must be free from metallic substances, for metal has an injurious effect on the silver coating put upon the paper. It was generally known in the photographic trade that approved raw paper stock could be obtained only at Rives, France, from Blanchet Frères & Kleber, or at Malmedy, Prussia, from Steinbach & Co., owing to the absence of metallic substances from the water at those points. These firms had for many years produced the concededly standard raw paper, and it was difficult to obtain any paper suitable for sensitizing purposes from any other source. Early in the year 1898 the said raw paper companies formed a combination and organized the General Paper Company of Brussels, and at once increased the price of raw stock. At this time the Eastman Kodak Company was manufacturing gelatine printing-out papers, called the Solio and Karsak papers; its business for 1898 amounting to $1,984,909.92. In 1894 the Eastman Kodak Company had acquired the Western Collodion Paper Company, and in 1898 it acquired the following companies: New Jersey Aristotype Company, Nepera Chemical Company, Photo Materials Company, Kirkland's Lithium Paper Company, the United States Aristotype Company, the American Self-Toning Paper Company, Brown & Palmer, and Palmer & Croughton. And in 1899 the defendants consolidated into the General Aristo Company the following concerns: Eastman Kodak Company (paper business), American Aristotype Company, Nepera Chemical Company, New Jersey Aristotype Company, Photo Materials Company, and Kirkland's Lithium Paper Company—practically controlling the business of manufacturing printing-out paper in the United States. Other concerns manufacturing gelatine and collodion papers disappeared from the market at about this time, but as to the causes for their so doing the proofs are not conclusive.

Previous to said consolidation the American Aristotype Company was doing a large business in collodion paper, netting a profit in 1898 of approximately $124,751, and in September of that year its president and Mr. Eastman entered into an agreement in London, England, with the General Paper Company, by which the Eastman Kodak Company obtained control of the Malmedy and Rives papers in the United States for gelatine emulsion printing-out purposes, while the American Aristotype Company obtained a similar contract in relation to collodion paper. It was provided that, in the event of competition arising, it should be driven out of the market, and the General Paper Company agreed to pay a proportionate rebate on all raw paper purchased from it and manufactured into printing-out paper sold at reduced prices for driving out such competition. It can

scarcely be doubted from this contract that it was contemplated to concentrate the manufacturers and dealers in photographic paper in the United States, and such impression is augmented by the letter in evidence addressed by Mr. Goffard, of the General Paper Company, to Mr. Eastman, wherein he refers to the acquisition of said paper companies as being part of the program outlined to him when a monopoly of the raw paper stock was requested of him. There is also another letter in evidence from which it clearly appears that a general understanding existed between Mr. Eastman and the General Paper Company that no sales of raw stock should be made to any dealers in photographic papers or supplies in the United States except the Eastman Kodak Company and the American Aristotype Company which became a subsidiary of the former.

As illustrative of the effect of such control of paper stock, attention is directed to the testimony of Dr. Baekeland, who stated that he needed a quantity of raw paper, but that it was refused him by Steinbach & Co. on the ground, as Steinbach subsequently stated in a letter to the Eastman Company, that he "thought it not prudent to accept an order for such a long time that could be an obstacle to an arrangemen with the Nepera Chemical Company." He also testified that during the summer of 1898 he was informed by the sales agent of the General Paper Company that in the future he must buy his raw stock from the Eastman Kodak Company, but that instead of so doing he went to Europe to arrange for a supply of raw stock, and was there joined by Mr. Eastman, who remarked that the Nepera Paper Company had made inroads in the trade in some articles manufactured by the Eastman Kodak Company, but that he would let Baekeland have raw stock on the condition that the sensitized paper business of the Nepera Company would not increase more than 15 per cent. To this Dr. Baekeland demurred, requesting permission to increase the business by 50 per cent. This request was denied, and the negotiations ended without his receiving any raw paper. Immediately on his return to the United States, in anticipation of difficulty in later obtaining it, he purchased as much raw paper, foreign and domestic, as he could, and was able to get from the American Photographic Paper Company paper adaptable for certain grades of Velox paper—a gaslight developing-out paper manufactured under his direction. However, the Nepera Chemical Company afterwards sold out its plants and properties to the Eastman Kodak Company under restrictive conditions to the effect that its officers were not to engage in the business of making sensitized photographic paper in North America for a period of 20 years, and the business was later moved to the plant of the defendant company at Rochester.

It will be unnecessary to dwell upon the manner in which the first and second raw paper contracts were made effective by agreements among certain other foreign companies, including G. H. Beneke and the Aschaffenburg Company, baryta coaters of photographic paper, and by the paying of indemnities. On December 9, 1898, an announcement was made to the trade by the Eastman Kodak Company that it had been appointed sole agent for Steinbach and Rives raw

paper for use in gelatine printing-out processes, and that discounts to consumers of Solio paper or any other paper sensitized from Steinbach and Rives stock would in the future be prohibited. This announcement was followed by a circular letter reading as follows:

"We call your attention to the fact that the Rives and Steinbach concerns make the only raw stock that has been successfully used for the manufacture of sensitive photographic papers. Having made us their sole agents for their papers for use in gelatine printing-out processes in the United States, Canada, and Mexico, all raw stock of their manufacture must of necessity pass through our hands. The raw paper will only be sold by us to other coaters who market their product under conditions similar to those upon which we sell the paper coated by ourselves. The New Jersey Aristotype Company, of Bloomfield, N. J., the Photo Materials Company, Rochester, N. Y., and J. G. Palmer, successor to Palmer & Croughton, Rochester, N. Y., are at present the only authorized coaters of Steinbach and Rives raw stock for gelatine printing-out process."

Terms of sale binding upon all dealers in photographic papers were thereupon put into effect. Discounts on raw paper were reduced from 25 per cent. to 15 per cent., but an additional discount of 12 per cent. was allowed to dealers who manifested by certificate that they had complied with the Eastman restrictions, which required the dealer to sell no other gelatine printing-out paper than that sold him by the Eastman Company. The New Jersey Aristotype Company and the American Aristotype Company, which had been acquired by the Eastman Company, required similar certification as a condition of the payments of discounts.

It was also shown that arrangements were made between the American Photographic Paper Company and the General Paper Company, whereby Mr. Curtis, who was connected with the former company, agreed not to manufacture, deal, or experiment in photographic paper, except with the consent of the General Paper Company, in consideration for which the latter agreed to buy 100,000 pounds of paper a year and pay the former an annual indemnity of $8,500. Thus the American manufacturers of photographic paper became subservient to the General Paper Company of Brussels, and the Eastman Kodak Company accomplished its purpose of controlling in this country the raw paper stock industry, both foreign and domestic.

The contract in question was renewed on December 20, 1906, for a term of nine years, without, however, including the baryta coaters, and continued in force until June 30, 1910, when it was canceled by mutual consent; such cancellation no doubt being due to the acquirement of the Artura Company by the Eastman Company (Government Exhibit 387) and the disinclination of the General Paper Company to bear further losses due to putting fighting brands of paper on the market (Government Exhibit 382). As a result of such contracts many competitors of the Eastman Company were interfered with in their business and some were driven from the market. By their inability to obtain raw paper their customers were compelled, not only to buy sensitized paper from the Eastman Company, but to handle Eastman products exclusively. Such use of the raw paper contracts cannot be justified by any plea that they were necessary to keep the

foreign raw paper combination from entering into business in the United States.

Anthony testified that in 1901, as a result of restrictive agreements with dealers there were only from 2 per cent. to 3 per cent. of them who were not receiving their supplies from the Eastman Company; and Cramer testified that, as late as the years 1906 and 1907, 5 per cent. of all the professional dealers and about 98 per cent. of the so-called side line dealers in the United States were selling products of the Eastman Kodak Company exclusively. The witness Kilborn testified that in 1898 and 1899 he was unable to get any suitable raw stock for making collodion paper; that he imported stock direct from Germany, and later bought some in this country from the Columbia Photo Paper Company, but that neither was satisfactory. Colwell testified that he was engaged in manufacturing sensitized photographic papers under the name of Kirkland's Lithium Paper Company, and had bought his stock from Rives or from the Aschaffenburg Company until February, 1899; that he then had about 10,000 or 12,000 customers, but was unable to obtain any raw paper. In this situation he was informed by Mr. Eastman that he could obtain paper only through him, as he had control of the mills that made it, and Mr. Eastman's proposal to purchase the Kirkland's Lithium Paper Company was then made and accepted. Waite testified that Mr. Eastman offered the American Self-Toning Paper Company, of which he was secretary, $60,000 for its business in the year 1898, which offer was declined, and that later, having difficulty in obtaining raw stock, the American Self-Toning Paper Company went out of business. Dailey, owner of the United States Aristotype Company, testified that he could not obtain Aschaffenburg coated paper or Steinbach paper, in which he had been dealing, and that there was no paper in this country of equal quality; that he endeavored to obtain such paper from the Eastman Kodak Company, but was informed that their supply was sufficient only for their own requirements; and that his business was greatly depreciated as a result of the rebate system inaugurated by the Eastman Kodak Company, dealers in many instances declining to further handle his product. Gennert testified that in the year 1900 he attempted to buy Rives and Steinbach stock for collodion printing-out paper, but failed in the attempt. The Defender Company likewise had difficulty in obtaining satisfactory raw paper; and in 1909 Eastman acquired 60 per cent. of its stock, which fact was concealed from the trade, and film thereafter sold by the Defender Company was manufactured by the Eastman Company, but falsely marketed as Vulcan film—a product of the Defender Company—and the price at which it should be sold by the latter and the discounts to the trade were "discussed" and determined upon.

There was other testimony to show interferences with the trade by reason of the control by Eastman of the raw paper stock, but it need not be dwelt upon. The evidence shows that in the year 1901 the General Aristo Company, a consolidated company, practically sold 95 per cent. of the photographic paper in the country, and that in

1904, when other satisfactory papers were available to the trade, its business in such commodity amounted to but 75 per cent.

On May 31, 1892, the Eastman Kodak Company acquired the business and good will of the Standard Dry Plate Company, of Lewiston, Me., later moving the machinery and merchandise to its plant at Rochester, and in 1907 the Standard Company was dissolved by order of the court. In August, 1902, the M. A. Seed Dry Plate Company of St. Louis was acquired under restrictive covenants that its officers should not engage in the business of manufacturing photographic dry plates within a period of 10 years without the consent of the Eastman Kodak Company. The assets of the M. A. Seed Dry Plate Company were $656,742.90, its liabilities $7,496,148. It was paying dividends at the rate of $240,000 per annum and was doing a business of $795,728.48; it was employing about 600 employés, but the plant was dismantled and the business moved to Rochester. The corporation was dissolved in 1911. The Stanley Dry Plate Company of Newton, Mass., was acquired in January, 1894, also under restrictive covenants on its officers not to engage in the manufacture of dry plates. This company was legally dissolved in 1905.

From 1902 to the date of the filing of the bill, the Eastman Kodak Company acquired the following stock houses, which were scattered through the United States and were engaged in selling photographic supplies: Sweet, Wallach & Co., Chicago, Ill.; O. H. Peck Company, Minneapolis, Minn.; Zimmerman Bros., St. Paul, Minn.; John H. Fouchs Company, Minneapolis, Minn; Kortwright & Kline Company, Sioux City, Iowa; Milwaukee Photo Materials Company, Milwaukee, Wis.; Robey-French Company, Boston, Mass.; Robert Dempster Company, Omaha, Neb.; Albert Sellner Company, Quincy, Ill.; Good & Schroeder, Chicago, Ill.; John Haworth Company, Philadelphia, Pa.; Northwestern Photo Supply Company, Seattle, Wash.; Glenn Photo Stock Company, Atlanta, Ga.; Standard Photo Supply Company, New Orleans, La.; Denver Photo Materials Company, Denver, Colo; Howland & Dewey Company, Los Angeles, Cal. In 1903 the Eastman Kodak Company acquired the Century Camera Company and the Rochester Optical & Camera Company, plate camera concerns engaged in business at Rochester, N. Y., and in 1905 the Folmer & Schwing Manufacturing Company, a plate camera concern of New York.

It is difficult to avoid the conclusion that the acquisition of the various companies was for the purpose of suppressing competition and in furtherance of an intention to form an illegal monopoly. Especially is this true when it is observed that in nearly every instance the conveyances contained restrictive covenants prohibiting the officers of the acquired concerns from re-entering the business for periods ranging from 5 to 20 years, thus serving, as said in the Tobacco Case, "as perpetual barriers to the entry of others" into the trade in question. As opposed to this view, the defendants contend, among other things, that the stock houses after purchase did not discontinue the sale of competing articles, and that out of 146 stock houses in the United States the defendant company controlled but 12 per cent., and

sold only approximately 12 per cent of its own products through them; but these contentions are not based strictly on the facts. The evidence shows that only a small proportion of the goods thus handled are purchased from other concerns; 86 per cent. of purchases, amounting to $1,838,952.13, being purchased from the Eastman Kodak Company. It was also urged that the restrictive covenants and acquisitions were necessary for the protection of the good will of the business, and that in most instances there was an inclination on the part of the vendor to sell. It is true that the defendants paid full value and more, giving money together with stock in a larger and more progressive enterprise in return for the property acquired; but in view of the fact that a majority of the plants were dismantled and the businesses concentrated at Rochester it is evident that they were not actually required by the defendants in carrying on their business, but were acquired with an idea of monopolizing trade, under which circumstances the details of the transactions are immaterial.

It appears that independent dealers were established by competitors as a protection from the encroachments of the Eastman Kodak Company; that in 1908 developing-out paper came into more extensive use, and Artura paper, which, though not entirely free from metallic substances, was nevertheless adaptable for such process, came rapidly into favor. To meet increasing competition from this source, the defendants, unfairly, I think, marketed the Nepera paper at reduced prices, and warned their dealers to refrain from dealing in Artura paper, although such paper was preferred by photographers. The Eastman Kodak Company afterward acquired the Artura Company for the sum of $1,250,000, restricting its officers from re-entering the business for 20 years; and although the former company, after dismantling the plant, retained in its employ a number of the officers and directors of the latter company, upwards of 180 employés were thrown out of work.

In 1899 a number of concerns manufacturing folding plate cameras, mainly for the amateur trade, to wit, the Rochester Camera Supply Company, Rochester Optical Company, Ray Camera Company, Western Camera Company, Monroe Camera Company, and the E. H. & T. Anthony Company, consolidated and formed the Rochester Optical & Camera Company, of which the Eastman Kodak Company at first was trade agent, but later became the owner.

Considering next the conditions imposed on dealers in relation to price and the exclusive handling of Eastman products, that the business of the defendants increased in magnitude as a result of such restrictions, which operated to drive out competition, is to me too plain for controversy. The price listing of commodities and the adoption of arbitrary rules to enforce the restrictions in my opinion so precluded freedom of ownership that they cannot be extenuated by the submission to the dealers of the questions of whether such restrictions should be adopted, or rigorously adhered to, or modified. The dealers, in view of the circumstances, no doubt were constrained to acquiesce in them, not only because of the discounts and extra profits that they would thus receive, but also because of the policy of limiting the

number of dealers by preventing others from entering business in their vicinity. Such trade policies were emphatically condemned in State v. Standard Oil Company, 49 Ohio St. Rep. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541. Monopolies thus formed are bound to become burdensome and menacing to our industrial welfare, and are entirely at variance with wholesome business conditions. Generally speaking, I think that a business should not be permitted to develop to such proportions as to unreasonably engross a trade. The devising of means for deterring others from manufacturing certain articles, or restricting the localities in which they may deal in such articles, fixing sales prices, or adopting regulations for governing dealers, to be enforced by special rewards or penalties, inevitably result in concentration of business in the hands of a few, and may also result in giving to a single person or corporation such a unification of interest or management as to constitute an illegal monopoly. This principle finds support in National Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689.

It is true that after the decision in Dr. Miles Medical Company v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, where the attempt by a manufacturer to control sales prices to consumers, even as to products made under a secret formula, was condemned, the defendants modified their restrictions with reference to the exclusive handling of photographic paper, certain view cameras, and a few other articles, but continued them unchanged as to others. But in my view the right to fix prices at which dealers may sell to customers and to impose on dealers conditions requiring them to sell defendants' goods exclusively, or the right of a patentee to control resale prices on a patented article are not controlling factors herein. It is settled law that a patentee may not by notice limit the price at which a patented article is to be sold at retail, where the retailer bought the article from a jobber paying the full price therefor. Bauer & Cie v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; United States v. Keystone Watch Case Company (D. C.) 218 Fed. 502. But the terms of sale in force in this case at the time of filing the bill fixed the price on all products (except as heretofore stated), regardless of whether they were patented or not, and bound the dealers to confine their sales to Eastman products. The sales restrictions, together with the raw paper contracts, the acquisition of plants and properties, stock houses, etc., and the covenants against producing photographic materials, indicate an intention to supplant competitors and to unduly and unreasonably restrain and monopolize interstate trade in photographic supplies. The intent and purpose with which the corporation defendants and the individual defendants participated in the various transactions, which when standing alone may be innocent enough, but which when correlated assume a different aspect, are proper subjects of inquiry. U. S. v. Union Pacific Railroad Company, 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124.

Defendants argue generally that manufacturers have the legal right to encourage dealers by extra profits or by other fair inducements to

handle their goods exclusively, that such an arrangement is to the interests of both, and that the Eastman Kodak Company was the first to induce stationers, druggists, and others to handle photographic goods as a side line. All this and more, it may be conceded, separated from other acts, might furnish no ground for holding that there was an illegal monopoly; but the arbitrary enforcement of the restrictive conditions by the establishment of a system of espionage, and the keeping of records of violations of such conditions, with a view of penalizing such dealers, are evidences of an intention to promote a monopoly. In this connection the language of the court in State v. International Harvester Co., 237 Mo. 369, 141 S. W. 672, and quoted in United States v. International Harvester Co. (D. C.) 214 Fed. 987, may be fittingly applied. There the court said:

"In the case at bar we are to take the acts of the parties and judge their purpose by the consequence that would naturally result. When men deliberately and intelligently go to work and acquire power that will enable them to control the market, if they choose to exercise it, there is no use for them to say that they did not intend to control the trade or limit competition; nor, when the legality of their act of acquisition is in question, is it any use for them to say, 'We have not used the power to oppress any one.'"

It is asserted that the right of a patentee to restrict the sales price of a patented article by agreement with the retail dealer has not been broadly decided; but it has been decided that patent rights and sales price restrictions for a patented article cannot be used as a shield to nullify the Sherman Act. As said by the Supreme Court in Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107:

"Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights an universal license against positive prohibitions."

It will be observed that the bill of complaint makes no mention of cinematograph film for moving pictures, but testimony in relation thereto was received over the objection of counsel. It was believed at the hearing that the term "film," as used in the bill, was sufficiently comprehensive to include different kinds of film and the uses to which it is put; but I now believe that it applies solely to film used in connection with hand cameras or film roll cameras, and that it was not intended at the time the bill was prepared to include moving picture film or any contracts or combinations in relation thereto as violative of the statute.

In the case of United States v. United Shoe Machinery Company, 222 Fed. 349, recently decided, the pleading of the government in a similar litigation under the Sherman Act was strictly construed, and the evidence confined to the specific acts averred in the bill. But, disregarding for the moment such technical objection, I am of the opinion that the contracts in evidence of the Eastman Kodak Company with the Motion Picture Patents Company and its licensees, and with the witness Brulatour, were not violations of the statute. Moving picture film has never been sold by the defendants under any terms of sale agreements, nor was it sold by dealers handling a general line.

of photographic materials. The Eastman Kodak Company was the first to commercially manufacture such film, which according to the evidence is made somewhat differently from roll film for cameras, either in this country or abroad, and a patent was granted Eastman for the process of making it. The contract (Government Exhibit 240) by which the Eastman Kodak Company agreed to supply to the Motion Picture Patent Company all the film manufactured by it to the exclusion of other purchasers of moving picture film, except an amount equal to 2½ per cent., was not an illegal contract. United States v. United Shoe Machinery Company, supra. The record shows that the so-called independent moving picture concerns were using Lumiere film, a product of France, and that one Brulatour, its agent in this country, afterwards arranged with Mr. Eastman to obtain the film required by him and his customers exclusively from the Eastman Kodak Company. Although the testimony of the witness Brulatour in respect to the defectiveness of the Lumiere film was severely criticised by the government as unreliable, I think it was fairly shown by the testimony of customers that grounds for complaint existed, and that Eastman film was desired by moving picture concerns, and that no intention was shown to illegally monopolize or restrain interstate trade in such commodity by the transaction in question.

The record abounds in compiled figures showing that large amounts of money were paid to acquire the competing concerns to which reference has herein been made, and to show their standing in the trade to prove that such acquisitions were not merely amalgamations of small concerns; also to show the amount of business transacted in different materials by the Eastman Kodak Company, its great gains and profits, which for the year 1912 amounted to $15,633,551.33, or about 171 per cent. on total sales amounting to $24,763.407.65, and showing the large disproportion between the cost of manufacture and the price paid by the consumer. Whatever reduction the Eastman Kodak Company may have made as to price, on portions of the photographic paper or other materials sold by them, does not compensate for the suppression of competition in the industry as a whole, and it is no justification of an illegal monopoly to assert that it has reduced the price of an article produced by it, as this may have been done simply to injure a rival. Richardson v. Alger, 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457.

But all these matters require no further special attention, save in so far as they bear upon the monopolization of the interstate trade in cameras, film, plates, and photographic paper; and as to these articles it is undisputed that the Eastman Kodak Company controlled approximately between 75 per cent. and 80 per cent. of the entire trade at the time of filing the bill, and had accordingly attained a monopoly thereof. The burden rested upon the defendants to prove that this was accomplished by lawful methods, that is, that it resulted from normal processes of growth, from the mere acquisition of property, or from the superior merit of the products, assuming this to have been an important factor; and after careful consideration of the various defenses interposed I have concluded that such burden

has not been borne, but that, on the contrary, the government has shown affirmatively that interstate trade and commerce have been unjustly and abnormally restrained by the defendants by the formation of a monopoly induced by wrongful contracts with regard to raw paper stock, preventing the trade from obtaining such stock, by the acquisition of competing plants, businesses, and stock houses, accompanied by covenants restraining the vendors from re-entering the business, and by the imposition on dealers of arbitrary and oppressive terms of sale inconsistent with fair dealing, and suppressing competition. Such acts, when taken together, are most significant and seem to me to indisputably disclose an intention to violate section 2 of the Sherman Act.

[2] There is marked dissimilarity between the acts disclosed in the record herein and those disclosed in United States v. United Shoe Machinery Company, supra, decided in favor of defendant, and those of other cases to which my attention is directed by defendants, wherein the evidence in the judgment of the court did not establish a combination in restraint of trade or a monopoly. In United States v. Keystone Watch Case Company, supra, it is true, there were acquisitions of plants and properties of competing manufacturers, and the court said it was no offense to add one department to another as the business prospered or ambition increased; that the size and varied character of the enterprise do not of themselves constitute a violation of the statute. To this principle I assent. There is no limit in this country to the extent to which a business may grow, and the acquisitions of property in the present case, standing alone, would not be deemed an illegal monopoly; but when such acquisitions are accompanied by an intent to monopolize and restrain interstate trade by an arbitrary use of the power resulting from a large business to eliminate a weaker competitor, then they no doubt come within the meaning of the statute. In the Keystone Case the court held that, although the prices were fixed, considering everything done, no monopoly was created. As to a circular restricting prices and forbidding dealers to sell goods of other manufacturers, the court said that the adaptation and enforcement of such policy operated as an unlawful restraint upon interstate trade, and as to this an injunction was granted. Support for the holding in this case is found in United States v. Gt. Lakes Towing Company (D. C.) 208 Fed. 733, where the court held that the sale of a business with an agreement within reasonable limitations not to enter into competition with the buyer, when it was not a device to monopolize, was not illegal, but that the acts of the defendant in cutting towing rates until competition was ended, and then restoring the previously existing rates, the exclusive contracts with vessel owners to tow vessels, and the giving of large discounts from tariff rates, were illegal acts, when by such means a practical monopoly is effected.

The final question relates to the nature of the decree. The government intimated at the hearing that under chapter 311, an act passed September 26, 1914 (38 Stat. 717), to create a federal trade commission, this court had the discretionary power, if it was proven that complainant was entitled to relief, to refer the case to such commis-

sion as a master in chancery to ascertain and report the appropriate form of decree herein; but in my opinion there is no present necessity for adopting this course, as by section 4 of the Sherman Act the equitable remedy to which resort may be had in such a case as this is pointed out, and the court vested with jurisdiction to prevent and restrain further violations of the act. In the Standard Oil Case, supra, Mr. Chief Justice White said:

"It may be conceded that ordinarily, where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future. Swift v. United States, 196 U. S. 375 [25 Sup. Ct. 276, 49 L. Ed. 518]. But in a case like this, where the condition which has been brought about in violation of the statute, in and of itself, is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies. As penalties which are not authorized by law may not be inflicted by judicial authority, it follows that to meet the situation with which we are confronted the application of remedies twofold in character becomes essential: (1) To forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute. (2) The exertion of such measure of relief as will effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about."

These remedies are thought applicable to the present situation. Although counsel for defendants concede that the court has power to dissolve an illegal combination of competing units, they nevertheless argue that no dissolution should be decreed herein, as the acquired property consisted of noncompeting units; but, as hereinbefore indicated, I do not agree with this contention. It makes no difference that some or all of the acquired concerns differently constructed some of their products, inasmuch as they were all engaged in the same business: that is, manufacturing or dealing in photographic supplies. The record (Appendix I,) shows that the total sales by defendants in 1912 of self-developed products amounted to $14,082,696.55, and of acquired products to $3,800,716.53, from which it would seem that no irremediable hardship would result from a separation of the present business into two or more independent companies. However, it is not at this time intended to indicate either a dissolution, division, or reorganization of the business of the defendants. It no doubt is possible that an adequate measure of relief might result from enjoining the unfair practices of the terms of sale agreements, and from a separation of the business; but the defendants should have an opportunity to present to the court on the first day of the 1915 November term a plan for the abrogation of the illegal monopoly which unduly and unreasonably restrains interstate trade and commerce.

In the meantime jurisdiction is retained by this court to make such other orders and decrees as may be deemed necessary to the granting of the relief demanded in the bill, or such other relief as the equities of the case may require, with costs.